[Civ. No. 25829. Second Dist., Div. Two. Sept. 19, 1962.]

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Plaintiff and Respondent, v. JOHN A. RYAN et al., Defendants and Appellants.

J. W. Ehrlich and N. E. Youngblood for Defendants and Appellants.

Hugo A. Steinmeyer, Gibson, Dunn & Crutcher, Sherman Welpton, Jr., and F. Lee Coulter, Jr., for Plaintiff and Respondent.

FOX, P. J.—Plaintiff bank brought this suit to impose a constructive trust upon certain assets standing in the name of the Ryans and for an accounting. Plaintiff alleges, in effect, that during the time defendant John A. Ryan[1] was an officer

---

[1]Hereinafter, for convenience, the designation "defendant" will refer to John A. Ryan.

of plaintiff bank he occupied a confidential and fiduciary relationship with and to the bank and that he violated the duty thus imposed; that he was guilty of fraudulent conduct; and that he was part of a conspiracy with his wife and others to defraud plaintiff. In sum, the bank charges that as a trusted official Ryan induced numerous borrowers from the bank to pay him fees, commissions, gratuities and gifts of substantial value for inducing the bank to approve their applications for loans and for persuading the bank to make the loans in question to such borrowers; and that in other transactions defendant used and personally profited by information that was available to him by reason of his position with and relationship to the bank. The defendants have appealed from an adverse judgment.

In view of some of the arguments that are made, it is important to have a comprehensive and accurate picture of defendant's various positions and responsibilities with plaintiff. The findings provide such a picture. They reveal that defendant went to work for plaintiff in May 1934 and that his connection with the bank was terminated on August 2, 1957. During all of this period he was a full-time employee and agent of the bank in a variety of capacities from teller to supervisor of loans, supervisor of loan development, assistant vice president and manager of one of plaintiff's branches. From July 1, 1938, to the termination of his connection with the bank, defendant was "a trusted officer of plaintiff." During the five-year period from 1937 to 1942 defendant's duties included the making and servicing of real estate loans to individuals but not to contractors and builders. During this period he acquired specialized knowledge in making and servicing such loans. In approximately April 1944 defendant was assigned to special duties by plaintiff at its Los Angeles headquarters which included the investigation of and reporting on matters relating to the making of loans by plaintiff that were insured by the Federal Housing Administration; in May 1946 defendant was appointed a supervisor of loan development. In April 1955 defendant became assistant vice president of plaintiff; in June 1957 he was made manager of the Santa Monica-Vermont Branch.

More specifically, with respect to plaintiff's lending operations it appears that commencing in May 1946 defendant's duties were to review and supervise the making, servicing and collection of loans made by plaintiff through its several branches to persons engaged in the business of building houses

in subdivisions. By November 1949 defendant's duties were expanded to receiving and processing applications for loans to finance subdivision building operations. Such duties included discussion of the general terms of such financing with prospective borrowers and with branch managers where the applications were originated; the obtaining and analyzing of credit and other pertinent information, the formation of judgments and recommendations based on such information and analysis, and the submission of such information to other more senior officers of plaintiff who were charged with final decisions in such matters, with his (defendant's) recommendation as to what action should be taken by plaintiff on the application for credit and as to the terms of the proposed credit. The court further found: "Plaintiff at all times placed trust in and reliance upon said defendant in the performance of his said duties and believed that the information obtained and submitted by said defendant with respect to proposed borrowers was truthful and accurate and believed that recommendations made by said defendant for the granting or withholding of credit and the terms and conditions upon which such credit should be granted were made in good faith by said defendant, and believed that in submitting such applications and recommendations said defendant was motivated solely to protect the best interests of plaintiff in the conduct of its banking business of extending credit"; also, that "During all of the time the said John A. Ryan was employed by plaintiff, the plaintiff reposed the utmost faith, confidence and trust in him, believed in and relied upon his honesty and integrity and believed that the said John A. Ryan would deal fairly and honestly with plaintiff in all things and would not abuse the power and authority vested in him . . ." and that during the time defendant was an officer of plaintiff (since July 1, 1938) he "occupied a confidential relationship with and to plaintiff."

At the time of defendant's employment on a permanent basis in November 1934 he agreed in writing that he would not use any information that he might receive as an employee of plaintiff for any purpose other than for the advancement of the interests of plaintiff.

In finding V the court stated: "Said John A. Ryan during his employment by plaintiff embarked upon and effected a scheme, practice and course of conduct beginning in 1944 by which he obtained fees, commissions, gratuities and gifts of substantial value from borrowers and customers of plaintiff

as a result of and by virtue of his position with plaintiff and in violation and breach of his position with plaintiff and of his confidential and fiduciary relationship with and to plaintiff, which course of conduct was concealed from plaintiff. Pursuant to the said scheme, practice and course of conduct said John A. Ryan exacted from such borrowers and customers of plaintiff or persuaded them to pay to him or to persons designated by him for his benefit sums of money for his assistance to such borrowers and customers in obtaining loans from plaintiff, . . ."

With respect to Mrs. Ryan's connection with defendant's activities the court found that she had "full knowledge" of her husband's scheme and practice of obtaining fees, commissions, gratuities and gifts of substantial value from borrowers from plaintiff bank by reason of his position with the bank and in violation of his confidential and fiduciary relation to it, and with such knowledge she connived, colluded and participated with her husband in carrying out and concealing said scheme and practice.

The court further found[2] that plaintiff had no knowledge of defendant's said scheme and course of conduct until August 1, 1957.

The initial question is: upon what theory is defendant liable to plaintiff? Reference to a few analogous cases and the principles there developed will be helpful in answering this question. In the early case of *Farmers' & Merchants' Bank v. Downey*, 53 Cal. 466 [31 Am.Rep. 62], it appears that defendant who was president of the bank loaned bank funds to the purchasers of a certain piece of property. The borrowers executed a note in favor of the bank for the amount of the loan with interest. As a part of the same transaction Downey made an agreement with the borrowers to the effect that he was to have one-sixth of the profits on the purchase and sale of the property. The court held that Downey could not be permitted to retain for himself the profits thus contracted for but must turn them over to the bank. The court stated: "Upon well-settled principles governing Courts of Equity, the defendant cannot be permitted to retain these profits for himself. They constitute part of the consideration which the borrowers paid or agreed to pay in obtaining the loan, and are as clearly the property of the corporation as is the interest accrued and stipulated to be paid on the face of the note it-

---

[2]Other findings dealing with specific transactions will be considered later.

self.'' In the course of the opinion the court quoted with approval from *Bain* v. *Brown,* 56 N. Y. 285, 288: ''When agents and others, acting in a fiduciary capacity, understand that these rules will be rigidly enforced, even without proof of actual fraud, the honest will keep clear of all dealings falling within their prohibition, and those dishonestly inclined will conclude that it is useless to exercise their wits in contrivances to evade it.''

*Broadway Fed. etc. Loan Assn.* v. *Howard,* 133 Cal.App.2d 382 [285 P.2d 61], was an action by a savings and loan association to recover secret profits made by Howard who was an officer of the association. In that case ''[t]he court . . . found that in numerous transactions the lending powers of the association and its powers to purchase loans were employed by Howard in making secret profits; . . . In order to further conceal from plaintiff his interest, Howard sometimes caused his profit in such transactions to be paid by plaintiff to Avalon [a corporation wholly owned by defendant Howard and his wife]. In other cases he concealed the profit by a check made payable to one of his 'dummies' or caused the check for his profits to be made payable to the seller or to some third person who had no connection with or interest in the transaction, without, however, the payee's knowledge or consent. . . . *The court found that Howard, by the same devices as hereinbefore mentioned, procured loans from plaintiff for borrowers and received a fee or commission therefor, but concealed this fact from the association.*'' (Emphasis added.) In affirming a judgment in favor of the savings and loan association, this court stated: ''It is admitted that during the time the transactions here in question took place Howard was a director, general manager, and president of plaintiff. Thus his fiduciary duty to plaintiff was established. A reading of the foregoing summary of the transactions amply supports the trial court's determination that Howard personally profited from them at the expense of plaintiff through the use of the association, its facilities and assets and *that in so doing he violated his fiduciary duty to plaintiff.*'' (Emphasis added.)

*Fleishhacker* v. *Blum,* 109 F.2d 543, which was an action by stockholders of the Anglo-California National Bank of San Francisco to recover for the bank profits or bonuses alleged to have been received by Fleishhacker, its president, as consideration for causing the bank to make certain loans to be used in a business venture in which he was interested, further illustrates the principle that a bank official ''who receives a bonus

or other consideration for procuring a loan of the bank's funds commits a breach of trust, and that the consideration so paid belongs to the bank and may be recovered by it." The court further commented that "[t]he Bank paid him a salary and had the right to command his undivided fealty in all matters pertaining to the lending of its funds."

Applying these principles to the facts of the case at bench, as found by the trial court, it is apparent that defendant's liability may properly be based either upon the violation of his fiduciary duty to the bank by reason of the position he occupied and his confidential[3] and fiduciary relation with and to it, or by reason of the violation of his duties as an agent of the bank and the confidence and trust thus reposed in him. But, argues defendant, the principles of the cited cases only apply to the president or other executive officers of a corporation; that although he became an officer of the bank in July 1938, he was not of such stature either as an officer or agent of the bank that his acts in handling the bank's business should be measured by the foregoing standards; that he was merely an employee and that any funds he may have received in any of these transactions from the borrowers created only a debtor-creditor relationship between him and the bank. This appraisal of defendant's position and responsibility to the bank is purely sophistry. This is particularly true in view of the court's findings as to the character of the duties that were assigned to him; the findings that he was an agent and officer of the bank; that the bank placed great trust and confidence in him; and that he occupied a confidential and fiduciary relationship with and to the bank.

If business is to be conducted on a responsible basis such as will command the confidence of the public, the high standards of business operations that are exacted of top management must also be demanded of those in the lower echelons, and even of those without managerial portfolio. As was said in *Fleishhacker*: "These high standards this court is not disposed to whittle down," nor are we disposed to limit the group to which the standards apply to those who have executive status. This philosophy seems to underlie Restatement of the Law on this point in the fields of both Agency and Restitution. ▮▮▮ As to the former, it is stated (Rest. 2d Agency (1958) § 388) : "Unless otherwise agreed, an agent who makes

---

[3]In defendant's pretrial statement, under the heading "Admitted Facts" he states: "7. Defendant John A. Ryan was an officer of plaintiff bank and occupied a confidential relationship with and to plaintiff."

a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal.'' ''Comment c—Use of confidential information'' is also pertinent: ''An agent who acquires confidential information in the course of his employment or in violation of his duties has a duty not to use it to the disadvantage of the principal, see § 395. He also has a duty to account for any profits made by the use of such information, although this does not harm the principal. . . .'' As to a fiduciary the Restatement declares: ''Where a fiduciary in violation of his duty to the beneficiary receives or retains a bonus or commission or other profit, he holds what he receives upon a constructive trust for the beneficiary. . . .'' (Rest., Restitution (perm. ed.) § 197, p. 808.) ''The rule stated in this Section is applicable although the profit received by the fiduciary is not at the expense of the beneficiary. . . .'' (*Id.*, com. c, p. 809.) See also section 2860, Labor Code.

Defendant relies on *Lister & Co.* v. *Stubbs*, L.R. 45 Ch. Div. 1, decided in 1890, in support of his position that the relationship between Ryan and the bank was that of debtor and creditor. However this early English case does not represent the present law in California when dealing with the type of relationships and transactions that the trial court found to be involved in the instant case. (*Farmers' & Merchants' Bank* v. *Downey, supra; Broadway Fed. etc. Loan Assn.* v. *Howard, supra; Fleishhacker* v. *Blum, supra;* Rest., Agency, § 388; Rest., Restitution, § 197.)

We shall now consider defendant's contention that the court erred in denying his demand for a jury trial.[4] To be entitled as a matter of right to a jury trial the action must be one which was triable by a jury at common law as the common law existed in 1850. (*Farrell* v. *City of Ontario*, 39 Cal. App. 351 [178 P. 740] ; *Bank of America* v. *Lamb Finance Co.*, 145 Cal.App.2d 702 [303 P.2d 86] ; *Pacific Western Oil Co.* v. *Bern Oil Co.*, 13 Cal.2d 60 [87 P.2d 1045].) The nature of the case ''may be determined from the relief sought as well as from the nature of the facts stated.'' (*Dills* v.

---

[4]As to the issues raised by the cross-complaint, the court ruled that defendants were entitled to a jury trial on some of the issues therein relating to libel, slander and defamation of character. When this point was reached in the trial, however, defendants stipulated to a dismissal with prejudice of all causes of action of the cross-complaint except the eighth which related to defendants' interest in the Bankamerican Family Estate Plan and that the issues thus raised would be determined by the court on the evidence previously submitted.

*Delira Corp.,* 145 Cal.App.2d 124, 128 [302 P.2d 397].) ██ If the gist of the action is for equitable relief, pleading a cause of action at law does not entitle a party to a jury trial as a matter of right where the facts found on the equitable issues will dispose of such cause of action. (*Dills* v. *Delira Corp., supra.*) ██ " ' [W]here the case as made by the pleadings involves the application of the doctrines of equity and the granting of relief, which can be obtained in a court of equity, and not elsewhere, the parties are not entitled to a jury trial.' " (*Holt* v. *Parmer,* 106 Cal.App.2d 329, 332 [235 P.2d 43], quoted with approval in *Tibbitts* v. *Fife,* 162 Cal.App.2d 568, 573 [328 P.2d 212].) ██ ██ Examination of plaintiff's complaint discloses that the gist of its action is equitable in nature. It contains fifteen causes of action. In the first and second causes of action the allegations indicate that the Ryans are constructive trustees of money and property which belong to plaintiff and that plaintiff is entitled to an accounting. Both of these causes of action are clearly equitable in nature and seek relief that only a court of equity can provide. The third through the eleventh causes of action seek to impress a trust on specified property. Obviously the relief sought in these causes of action is exclusively equitable. The twelfth, thirteenth and fourteenth causes of action were dismissed by plaintiff. The fifteenth cause of action which on its face seeks to recover damages for fraud and also exemplary damages need not be analyzed and classified for the court did not make any award against defendants on this cause of action. Therefore, the defendants were not prejudiced in any event. The trial court properly denied defendants' request for a jury trial.

*Ripling* v. *Superior Court,* 112 Cal.App.2d 399 [247 P.2d 117], relied on by defendants, is clearly distinguishable from the case at bar. *Ripling* involved a situation where the alleged trustee admitted the funds were held for the use of plaintiff. The court there stated: "Our own case is not for the declaration of a trust, existence of which the defendant admits, but presents the simple question whether trust money is still held by the trustee." Further, in that case legal remedies, i.e., money damages were sought and were entirely adequate; in the instant case the remedies sought are only cognizable in equity. (See *supra.*)

Defendants contend there is no evidence to support a number of the findings that cover specific transactions. ██ In examining the evidence touching the findings we must, of

course, bear in mind that it was for the trial court to pass upon the credibility of the witnesses and determine the inferences that should be drawn from the evidence. We must therefore view the evidence and the reasonable inferences therefrom in the light most favorable to the successful party in the trial court. (*Estate of Teel,* 25 Cal.2d 520, 526 [154 P.2d 384].) When the evidence is so examined we find it sufficient to sustain each of the challenged findings. Since the discussion of these factual matters is of no particular interest to the profession generally, we shall place it in a footnote.[5]

The basic difficulty with defendants' argument on the insufficiency of the evidence to support the numerous findings that he has challenged on that ground is that he would have this court reevaluate the credibility of the witnesses, reweigh the evidence and draw inferences contrary to those drawn by the trial court. Under firmly established principles we are not at liberty to do this. (*People* v. *Gould,* 111 Cal.App.2d 1, 8 [243 P.2d 809] ; *Anchor Casualty Co.* v. *Surety Bond S. & L. Assn.,* *204 Cal.App.2d 175, 180 [22 Cal.Rptr. 278].)

Defendant argues that many of the transactions herein involved were not within the scope and course of Ryan's employment with plaintiff bank and therefore the bank cannot recover.

 The answer to this contention is twofold: (1) implicit in the findings the court made as to these various transactions is the determination that each of these matters was within the general area of defendant's duties and responsibilities with the bank; and (2) this is an action based upon the breach of defendant's fiduciary duty to the bank and once the court has found on substantial evidence that this duty has been violated by the defendant in a particular transaction, it is no longer important to determine whether the particular act falls within the scope and course of defendant's employment.

Defendant attacks another group of findings of fact and a number of conclusions of law on this basis: "The failure of the trial court to recognize that the relationship between defendant and his employer, plaintiff bank, as to the monies wrongfully received by defendant, is that of debtor and creditor completely voids" such findings and conclusions.

---

[5]See footnote 5 at end of opinion.

*Appealed under the title of "City of Los Angeles v. Anchor Casualty Company."

Defendant's major premise is that the "monies wrongfully received" by him created merely a debtor-creditor relation between him and plaintiff. We have demonstrated *ante* that defendant is completely in error in espousing this thesis.

By reason of his position and in view of the confidential and fiduciary relation that defendant occupied with and to the bank and the duty thus imposed upon him, and his violation of such duty in the many transactions herein, the monies and property received by him from these deals in equity and in good conscience belonged to the bank and he therefore held the same as a constructive trustee for the bank. Defendant makes no other attack upon these findings and conclusions. They therefore stand without any successful challenge.

Defendant attacks Finding XI 9 relating to monies received by defendant from Carol Heers claiming that the "clean hands" maxim precludes plaintiff bank's recovery with respect to this transaction. Defendant cites no authority to show the applicability of this doctrine to the case at bar. Further, defendant in no way shows that the bank's act of extending credit to the Long Beach bank in connection with loans to Heers Brothers is illegal, in violation of any statute or case law, or against any public policy. Except for the broad statement that making out-of-state loans was against the policy of plaintiff bank, there is not even a claim that plaintiff bank was guilty of any wrongful act. It must be recalled that it was the act of defendant Ryan in diverting business away from plaintiff bank to the Long Beach bank that made this transaction possible. The trial court did not have to *sua sponte* delve deeper into this transaction when the only questionable act apparent herein was the diversion of business by Ryan in violation of his fiduciary relationship. Defendant's argument, therefore, is without merit.

There is also no merit in defendant's argument that the court erred in allowing interest from the time the monies were received by defendant to the date of the judgment.

The law is clear that if a constructive trust is to be imposed on money and other property, the beneficiary thereof is entitled to recover not alone the money and property so acquired but also interest on such money at the legal rate from the time of its receipt and the rents, income and profits on such property together with interest thereon at the legal rate from the time of receipt. Any other principle of law would reward the wrong doer by permitting him to

obtain the benefit and use of the property and money which he had wrongfully obtained without accounting for the rents therefrom or interest thereon.

In *Fleishhacker, supra,* the applicable principle with respect to recovery of interest in a case such as this is correctly stated: "The court did not err in allowing interest on the various sums received by Fleishhacker. The amounts received by him as salary and dividends belonged, in equity, to the Bank. Upon these funds the Bank is entitled to interest. It is likewise entitled to interest on the proceeds received by Fleishhacker from the sale of the stock. See Cal. Civ. Code, § 2237; Restatement, Trusts, § 208, Comment f. To deny interest on these sums would be to permit Fleishhacker to profit from the use of moneys belonging to the Bank." (See also *Jud Whitehead Heater Co.* v. *Obler,* 111 Cal.App.2d 861, 871-872 [245 P.2d 608]; 1 Rest., Restitution (perm. ed.) § 156, p. 618; Civ. Code, § 2237.)

Relying on *Tevis* v. *Beigel,* 174 Cal.App.2d 90 [344 P.2d 360] defendant suggests that his conduct in the transactions here involved should be considered as merely "constructively fraudulent" and therefore the allowance of interest should have been treated as a discretionary matter under section 3288, Civil Code. We do not view defendant's acts so lightly as suggested. In any event the trial court was justified in awarding interest on the basis that it did.

The judgment is affirmed.

Ashburn, J., and Herndon, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 13, 1962.

---

[5]Findings VIII (b) and (c) related to two payments of $1,000 each by the Seco Company through C. M. Owen. Finding VIII (b) provides in pertinent part: "On or about September 16, 1955, the Seco Company, through its agents, applied to plaintiff for a loan of $370,000 for the financing of the construction of 40 subdivision homes at Riverside, California. The application for said loan was processed by the defendant John A. Ryan; the recommendation of the said defendant for the approval of said loan application was approved by plaintiff on or about September 19, 1955. Upon demand of the defendant John A. Ryan the said Seco Company paid to C. M. Owen upon the order of the defendant John A. Ryan and for his account the sum of $1,000 on or about September 24, 1955, as a fee, commission, . . ." etc. in violation of his confidential and fiduciary relationship with plaintiff.

Finding VIII (c) reads in material part: "On or about October 24, 1955, the Seco Company, through its agents, applied to plaintiff for a loan of $100,000 to finance the construction of ten subdivision homes at Riverside, California. On or about December 29, 1955, the said Seco

Company, through its agents, applied to plaintiff for a loan of $300,000 to finance the construction of 30 subdivision homes at Riverside, California. The applications for said loans were processed by the defendant John A. Ryan; the recommendations of the said defendant for the approval of said respective loan applications were approved respectively on or about October 26, 1955, and January 4, 1956. Upon the demand of the defendant John A. Ryan the said Seco Company paid to C. M. Owen upon the order of the defendant John A. Ryan and for his account the sum of $1,000 on or about December 27, 1955, as a fee, commission, . . .'' etc. in violation of his confidential and fiduciary relationship with plaintiff.

Jack Ewins' testimony established that he and his wife Lucretia had a one-third interest in the Seco Company; that his associates were Mr. and Mrs. Shidler and Mr. and Mrs. Coppo. Ewins further testified that the Seco Company paid Ryan $2,000 by means of two checks payable to the order of C. M. Owen, in the amount of $1,000 each, dated respectively September 24, 1955 and December 22, 1955. Ewins did not know that C. M. Owen was a woman. Mrs. Owen admitted receiving the checks.

Mrs. Owen and her husband formerly lived in Los Angeles. She was a licensed building contractor. She built some 300 homes during the late '30's and early '40. It was in this business that she first met defendant who was then Assistant Manager of plaintiff's West Adams and Orange Branch. She handled most of her loans through that branch. She had approximately two hundred transactions with Ryan in connection with her construction business. She became acquainted with Mrs. Ryan soon after the Ryans married. Mrs. Owen and her husband moved to a ranch in Humboldt County in 1942. During the next five years Ryan would visit them at the ranch for a few days. The Owens later moved to Arcata. After the marriage of the Ryans in 1947 Mrs. Ryan came with her husband on these visits. From 1947 until the death of Mr. Owen they would see the Ryans when they were south and have dinner together two or three times a year.

Mrs. Owen began to receive checks from builders and the Ryans in January, 1954. This continued from time to time for three or four years. The total of these checks was a substantial sum. With the consent of the Ryans she used some of these funds when her husband was ill, deposited other funds in savings accounts, and used some to purchase launderette equipment on which she gave Mrs. Ryan a mortgage in the amount of $9,871 in January 1958. Mrs. Owen apparently always accounted to the Ryans for all funds she received.

Mr. Shidler, who with his wife owned a one-third interest in the Seco Company, identified the checks and testified that Ryan requested that they be made payable to C. M. Owen and that he gave one of them to Ryan at a dinner party at the Beverly Hilton Hotel; that he did not recall whether the second check was mailed or delivered in person. Shidler also testified that the financing the Seco Company obtained from plaintiff required the builders to agree to buy the loans made by the bank to ultimate purchasers of the homes at not less than 95% of the unpaid balance. Shidler further testified he asked Ryan to relieve him of this obligation by finding ''a take out for the loans from the bank in event they could not be sold for the 95%.'' Ryan thought he could take care of that and later stated he wanted $25 a house for this service. Shidler told Ryan he would pay that, and testified he did later pay it. The obvious purpose of this testimony was to show that the two $1,000 checks in question were not given in connection with the procurement of the loans mentioned in findings VIII (b) and (c). But, of course, the trial court was not required to, and obviously did not, believe this portion of Shidler's testimony.

The circumstances relative to the handling of these transactions and the inferences reasonably to be drawn from the evidence amply justify

and support these findings. It will be recalled that the application for the first loan was approved on or about September 19, 1955 and the first $1,000 check was dated September 24th—only some five days after the loan was approved. The other two applications for loans were approved respectively on or about October 26, 1955 and January 4, 1956. The second $1,000 check was dated December 22, 1955. It is not without significance that the second check was given some two months after the approval of the first of these two loans but only approximately two weeks prior to the approval of the second loan. Also, it is not without significance that Ryan requested that these checks be made out to C. M. Owen who lived in the northern part of the state and with whom he had had a close business and social relationship for years. It will be noted that these transactions were handled so that Ryan's name did not appear on the checks. If these transactions were legitimate it would seem there was no valid reason why they should have been handled in such a secretive fashion and in such a circuitous manner. The court could readily draw the inference that these checks were payments for Ryan's services in procuring these loans.

Findings XI 2, 3 and 4 relate to payments made by Ray R. Conners, Jr., through Arrow Heights, Inc., in connection with Conners' project known as Montecito Oaks in Santa Barbara County. Conners related a number of transactions that he had with Ryan in which he made various payments to Ryan in connection with his financing and growing out of Ryan's position with the bank. Conners had made a deposit on the Montecito Oaks property and had made a tract map preparatory to its sale. He asked Ryan if he knew of anyone who would be interested in purchasing this project. Ryan said he would give the matter some thought. Thereafter he referred Conners to the Moss Construction Co. Conners told Ryan he "would make the same 5% arrangement as on the prior deal." The Moss Co. purchased the property. Later this company arranged a loan from the bank which was approved by Ryan.

Conners told Ryan payments would be made as the money was received by him from the Moss Co. Ryan informed Conners he wanted the payments made through a real estate broker because of his (Ryan's) relationship with the bank and asked him to make the first check to David H. Millerburg. On November 8, 1952, Conners issued an Arrow Heights, Inc. check for $2,000 in favor of Millerburg on account of Ryan's commission. Later Ryan requested Conners to make the next check payable to Ray E. Viers, telling him he was using Viers instead of Millerburg because of the latter's tax bracket. The next check was for $2,500, dated September 8, 1954, and payable to Viers. A third check, dated January 21, 1955, for $2,125 in favor of Viers was also executed by Conners in connection with this transaction.

Defendant argues that this transaction is simply the case of a land owner paying a commission to a third party for putting him in touch with a buyer for his property and that he owed plaintiff no duty in this transaction. It is, however, a reasonable inference that defendant used his position with the bank and the information thus made available to him as a substantial means of bringing about this deal. Defendant's arrangement to have the payments made through a real estate broker because of his "relationship with the bank" shows that he was conscious of the impropriety of his taking a fee or gratuity for this transaction, and the fact the sum he received would be reduced by the amount of the real estate broker's income tax on such payments indicates defendant regarded his infraction as serious for he was, in effect, paying to conceal it. Certainly we cannot say, as a matter of law, that the trial court could not draw sufficient inferences reasonably to adequately sustain its findings as to these three payments.

Finding XI 5 relates to the Brown (Gardena Builders) transaction. Theodore N. Brown of San Rafael, California, was formerly engaged

in business with his brother, Howard, under the fictitious name of Gardena Builders. Howard died in November, 1951. In approximately January, 1952 Gardena Builders issued their check for $2,033.31 payable to Ryan as a finder's fee for putting them in touch with builders who allowed them to invest money in their projects. The amount of the check represented 10% of the profit. The witness, Theodore N. Brown, did not participate in any negotiations pertaining to this transaction. Ryan later brought this check back to the witness in Reno and requested another check be issued in its place payable to Ray Viers. This was done. Gardena Builders was a borrower from the bank during this period. Their application for a loan was handled by Ryan.

Viers' ledger sheets under date of February 5, 1955, showed ''Received $2,033.31 finder's fee Brown Auto Company.'' Viers was unable to recall anything about the disposition of the proceeds of this check. However, his ledger sheet of the same date showed ''$750 returned to J. Ryan.'' Viers further stated he had never done any work or performed any services for Brown Auto Company and the company was not indebted to him. He also testified about certain checks that he handled for the Ryans and said ''There might have been others but I don't recall them.'' Here the court reasonably could draw the inference that the information furnished the Gardena Builders about projects in which they could invest was furnished by defendant as a result of information he was able to develop by reason of his position with plaintiff and that the financing that plaintiff bank provided Gardena Builders had some relation to these investments. Returning the original check with a request that a new check be made out to Viers is significant in view of his testimony that he had done no work for nor performed any services for the company and that it did not owe him anything and his further testimony of having handled other checks for the Ryans. Then the ledger entry, on the same date the check was received, showing ''$750 returned to J. Ryan'' is revealing. In view of Ryan's interest in the outcome of this case, the judge could well, and undoubtedly did, disbelieve his story that Viers had provided Gardena Builders with these business opportunities, particularly since Viers himself did not make any such claim. True there is a conflict in the evidence here but the trial judge, as was his discretionary right, has resolved that conflict against defendant. The circumstances surrounding this transaction adequately support the court's finding that the check to Viers for $2,033.31 was paid to him on the order and for the account of Ryan.

Finding XI 10. This relates to a payment of $1,000 in cash by Harold Heers. This is another so-called finder's fee transaction. Harold Heers is a licensed general contractor. Heers Associates of Nevada built Jarupa Grande in Nevada in connection with which he had dealings with Ryan. Heers testified Ryan telephoned him saying ''he had certain investors in trouble on a project and asked if we were interested in taking it over.'' It is in connection with this deal that the $1,000 was paid in cash by Feers either to Ryan or Cal Helgoe. Heers was uncertain to whom he paid the money. Helgoe denied receiving it. It is a reasonable inference that defendant received the information that the investors were in trouble on a certain project by reason of his position with plaintiff. The trial court properly concluded that he was not entitled to profit personally from its use.

Findings XI 12 and 13 relate to the payment of a number of Ryan's bills in 1954, totaling $1,071.57, by Los Altos Investment Company and the payment in 1956 of Ryan's note for $1,275 at the First National Bank of Long Beach.

Alfred Reinertson had been employed by plaintiff bank from 1926 to 1949. He had known Ryan for many years. Reinertson was president of the Long Beach National Bank from June 1953 to August 1958.

During this period Ryan had been instrumental in referring certain customers of plaintiff to the Long Beach bank so that the latter institution could appear as the originator of loans for these customers and thereby share in the loan fees which were quite substantial. In this connection it should be recalled that Ryan had borrowed $1,275 from the Long Beach bank and had executed his note therefor. This is one of the items that Reinertson caused to be paid for Ryan. During this period Reinertson's "companies had many loans from the [plaintiff] bank." It is quite apparent from the record that Reinertson and Ryan were quite close friends, for upon numerous occasions Ryan simply telephoned Reinertson or sent him a note requesting that he p..y certain bills for Ryan. It seems that Reinertson always honored these requests. It is these items that make up the total of $1,071.57 referred to in Finding XI 12.

Reinertson produced a ledger sheet of Los Altos Investment Company showing these various items as accounts receivable from Ryan. Reinertson also identified a promissory note dated February 14, 1958, for $2,581.22 signed by Ryan. This was a renewal of an earlier note. No payments had ever been made.

In view of the close relationship that existed between Ryan and Reinertson, the many business transactions between them, the nature of these transactions, the character of Ryan's debts that Reinertson paid, and the failure of Ryan to make any reimbursement over a substantial period, justified the trial court in drawing the inference that these payments represent gratuities growing out of Ryan's position and duties with plaintiff and that the ledger account and promissory note were mere subterfuge.

Finding XI 15 relates to a payment by San Antonio Manor in the amount of $3,095. Ray Conners testified that in connection with financing from the bank for the building of 219 houses in San Antonio Manor and Arrow Heights in Upland, California, he asked Ryan if he knew anyone who would be interested in take-out loans in connection with this project. Ryan responded by referring Conners to Mark Taper; Conners told Ryan that he would pay him 5% commission on any such take-out loans. Ryan said "that would be agreeable." Conners paid Ryan therefor the sum of $3,095 by a check drawn on San Antonio Manor which was signed by Conners and which was dated April 17, 1952. Ryan told Conners to have the check made payable to David Millerburg.

With respect to this transaction the trial court could have reasonably inferred that defendant's position with the bank and the information thereby made available to him enabled him to complete this deal and to personally profit therefrom. As pointed out supra with respect to Findings XI 2, 3 and 4, the fact that Ryan had the check made payable to a third person (Millerburg) manifests a consciousness on Ryan's part of the impropriety of his taking a fee or gratuity for this transaction. We cannot say that this finding, as a matter of law, is not supported by substantial evidence.

Finding XI 16 relates to payments totalling $10,923.47 made by Snow & Co. Snow testified that he first met Ryan at the bank during the summer of 1953 when he was sent there by Bucky Barr who worked for Builders Control. At that time he had a conversation with Ryan concerning construction loans and around October 1954 Ryan first told him that his company should pay him (Ryan) $2,000 for his services in connection with several bank loans. Thereafter he had a series of transactions in which he paid Ryan in connection with such loans. In the early part of 1955, Snow was brought in contact by Ryan with Julius C. White who was also a borrower from the bank and had an option on West Covina property. Snow was apparently interested in the deal but said he did not have the money to put into such a transaction. In response, Ryan suggested he thought he could get Snow a loan with the Long Beach National Bank through Reinertson. This

was done, enabling Snow to put approximately $20,000 into the deal. Ryan and Mrs. Ryan signed a promissory note for $10,000, which was payable to Snow as security for any losses he might incur in this transaction, but this note was not used by Snow in connection with the financing. In May 1955 the West Covina property was sold at a profit of over $30,000 which was distributed one-third to White, one-third to the Ryans, and one-third to the Snows. In distributing these proceeds Ryan asked Snow to have the cashier's checks for his share of the proceeds made payable to Long Beach National Bank. Pursuant thereto on May 4, 1955, a cashier's check for $8,025.56 and on May 10, 1955, an additional cashier's check for $1,568.48 were issued. In addition there was paid the sum of $1,329.43 on April 12, 1955. At the time of this transaction, Snow or his companies were indebted to the bank.

These facts show the relationship between Snow and Ryan over a long period of time. The act of referring and diverting business away from the bank constituted a breach of his ''undivided fealty.'' The bank had a right of first refusal on this loan and was deprived of that right by Ryan's act of diverting the loan opportunity to the Long Beach bank. It was reasonable for the trial court to infer *on the basis of the above evidence (especially in view of the previous transactions between Snow and Ryan)* that because of the diversion and Ryan's relationship and position with the plaintiff bank, the West Covina deal was made possible, allowing Ryan to personally profit.

Defendant stresses the point that he would have shared in any losses that might have occurred and, therefore, since the bank would not share in those losses, any profit which would result could not be due to defendant's position with the bank. This contention is clearly without merit. A breach of a fiduciary relationship does not depend upon the certainty of profits and the fact that losses may result instead of profits in no way changes the fact that there was such a breach.

Finding XXIII relates to certain real property known as the Whipple Street property. The trial court's finding that this property was acquired by defendant Ryan as a fee, gratuity, etc., from Burlos Homes, Inc., and from Ray Conners and Jack Ewins and their companies as a result of Ryan's position and fiduciary relationship with plaintiff bank is supported by the following substantial evidence: C. J. William Millerburg testified that he became involved with Ryan concerning a four-unit apartment in connection with obtaining a loan for his company, Burlos Homes, through the bank in the amount of approximately $650,000 for the construction of 126 homes. Arising out of this transaction he agreed to build a four-unit apartment for Ryan at no contractor's fee or overhead. This unit was built and title was transferred from Burlos Homes to Ryan. Although there were some complex financial transactions intervening the end result was that Ryan did not pay him (Millerburg) anything for this property. From this testimony the trial court could reasonably infer that the unit was a fee or gratuity to Ryan in exchange for his services in obtaining loans from the bank and for other services made possible by Ryan's position with the bank.

In addition to the four-unit apartment, a two-unit garage apartment is also included in Finding XXIII. With respect to this garage apartment Ray Conners testified that Ryan asked him ''how he could be compensated for this and other services'' (in connection with a Barstow project which involved bank financing). Conners answered ''it was my suggestion—10% of the profit.'' This was not paid in cash but was paid by the construction of the garage apartments by Conners' company on the Whipple Street property. This construction cost a total of $9,126.26, which constituted 10% of the profit on Conners' project. Defendant concedes that this statement constitutes sufficient evidence to support this finding but argues that since the loans obtained herein

were beneficial to the bank, the bank was in no way harmed by Ryan's conduct. The fallacy of this argument lies in a failure to recognize the nature of the fiduciary relationship of Ryan with the bank. Any secret profits which Ryan obtained as a result of such relationship constituted a violation of his fiduciary duty and the bank may recover therefor.

Finding XXIV relates to the rental income of the Whipple Street property. The amount of rental income for which the defendants were held liable was taken from income-tax returns. (Exhs. KK 1-11.) The figures submitted on the Whipple Street property on Schedule 1 were compiled directly from these exhibits. It is quite apparent that these income-tax returns showed the lowest possible net rental income for the years in question. Furthermore, the defendants were only charged with interest on the net amount of rental shown by their income-tax returns from the end of each calendar year. In regard to the rental value of the apartment occupied by the Ryans, defendants complain that the court erred in following Schedule 1 which charged them with rental on· this unit from July 1946. An examination of Finding XXIV, however, establishes the contrary; namely, that they were charged with the rental value from and after July 1, 1947, which is when they began occupancy of the property. Their income-tax schedules further showed that they derived rental income from some of the Whipple Street units in the amount of $105 a month and the testimony established that they occupied the largest and best of these units, particularly with the improvements made by Conners in 1948 and 1949 which cost $1,424.61. (Ryan, however, received a credit of $585 plus interest on this item.) The judgment charged them only with the approximate average rental of these units, namely, $85 a month, and, again, interest on the rental only from the end of each year. From the above facts it appears clear that Finding XXIV is supported by substantial evidence.