[No. A096725. First Dist., Div. Four. Mar. 28, 2003.]

KENNETH HIRSCH, Plaintiff and Appellant, v.
BANK OF AMERICA, N.A., Defendant and Respondent.

[No. A096726. First Dist., Div. Four. Mar. 28, 2003.]

NORMAN E. TAYLOR et al., Plaintiffs and Appellants, v.
UNION BANK OF CALIFORNIA, N.A., Defendant and Respondent.

[No. A096727. First Dist., Div. Four. Mar. 28, 2003.]

THELMA BAKER, Plaintiff and Appellant, v.
WELLS FARGO BANK, N.A., Defendant and Respondent.

[No. A096728. First Dist., Div. Four. Mar. 28, 2003.]

JESSICA B. SIEGEL, Plaintiff and Appellant, v.
IMPERIAL BANK, Defendant and Respondent.

## COUNSEL

Lieff, Cabraser, Heimann & Bernstein, William B. Hirsch, Barry R. Himmelstein, Stephen H. Cassidy; Orme & Grabstein and John Robin Orme for Plaintiffs and Appellants.

Morrison & Foerster, James F. McCabe and Stephen E. Paffrath for Defendant and Respondent Bank of America, N.A.

Severson & Werson and William L. Stern for Defendant and Respondent Wells Fargo Bank, N.A.

Nixon Peabody and Paul J. Hall for Defendant and Respondent Union Bank of California, N.A.

Arter & Hadden and John L. Hosack for Defendant and Respondent Imperial Bank.

Greines, Martin, Stein & Richland, Robin Meadow and Cynthia E. Tobisman for California Land Title Association as Amicus Curiae on behalf of Defendant and Respondent Bank of America, N.A.

## OPINION

**REARDON, J.**—The second amended complaints (SAC) in these consolidated appeals alleged that defendant banks engaged with title insurance and escrow companies (hereafter, title companies) in an elaborate and illegal kickback scheme: In exchange for substantial escrow funds deposited with defendants in demand deposit accounts, the banks pursued a series of illegal practices resulting in disguised interest payments to the title companies. These practices violated federal prohibitions against paying interest on demand deposit accounts.[1] Through these practices the banks assisted the title companies in converting such interest to their corporate accounts instead

---

[1] Under federal law, national banks and state chartered banks that are members of the Federal Reserve cannot pay interest on demand deposit accounts. (12 U.S.C. § 371a; 12 C.F.R. § 217.1 et seq. (2002) (Regulation Q); see also Fin. Code, § 854 [recognizing Federal Reserve Act's preemptive effect on bank's payment of interest].)

of paying it over to plaintiffs, the depositing parties to the escrows, as required by California law.[2]

Sustaining demurrers to plaintiffs' complaints without leave to amend, the trial court concluded that assuming the banks violated federal law, interest should never have been paid on demand deposits maintained by the title companies in the first place. However, the banks' conduct did not amount to aiding and abetting the title companies in keeping anything from plaintiffs to which they were entitled. Accordingly, the court ordered dismissal of the complaints.

We concur that plaintiffs were not entitled to interest in the first place and hence affirm the judgments as to causes of action seeking damages, restoration or restitution on account of such interest. However, plaintiffs' unjust enrichment claim also seeks restitution based on excessive and unjustified fees passed on to them, which the banks allegedly charged for cash management services. That cause survives demurrer. Accordingly, we affirm in part and reverse in part.

## I. BACKGROUND

### A. *The Parties*

Appellants[3] are property owners who, in the course of consummating real property transactions, placed funds in escrow with various title companies which in turn deposited those funds in demand deposit accounts maintained by respondent banks. Respondents are three national banking associations and one state banking corporation.[4] Appellants sued the Banks on their behalf and similarly situated others,[5] as well as the general public.

### B. *Regulatory Framework*

#### 1. *Title Insurance Industry*

California regulates the title insurance industry pursuant to Insurance Code section 12340 et seq. Pertinent here is Insurance Code section 12413.5,

---

[2]Insurance Code section 12413.5, dictating that interest on escrow accounts be paid to the depositing party unless contrary instructions are given.

[3]Appellants are Kenneth Hirsch, Norman E. Taylor, Connie S. Taylor, Lynne Thompson Jones-Brittle, Yolanda Altares, Thelma Baker and Jessica B. Siegel.

[4]Respondents are Bank of America, N.A., Wells Fargo Bank, N.A., Imperial Bank and Union Bank of California, N.A. (Banks).

[5]The SAC define the proposed classes this way: "**All persons or entities who, from 1980 to the present, incident to purchase, sale or refinancing of real property located in California, *deposited* funds in escrow trust accounts maintained by Defendant and were not paid interest that was earned on their escrow funds.**"

mandating that (1) all funds received by a title insurance company in connection with any escrow must be deposited with a financial institution and (2) the funds so deposited belong to the person entitled thereto under the escrow terms. Additionally, any interest received on those funds "shall be paid over by the escrow to the depositing party to the escrow unless the escrow is otherwise instructed by the depositing party, and shall not be transferred to the account of the title insurance company . . . ." (*Ibid.*)

Title insurance companies are subject to the disciplinary and enforcement powers of the Insurance Commissioner. (Ins. Code, §§ 12410, 12411, 12928.6.)

### 2. *Federal Regulatory Framework*

The Federal Reserve Act[6] prohibits member banks of the Federal Reserve System from paying, either directly or indirectly, any interest on any demand deposit. (12 U.S.C. § 371a; see also Reg. Q.) Regulation Q defines interest as "any payment to or for the account of any depositor as compensation for the use of funds constituting a deposit. A member bank's absorption of expenses incident to providing a normal banking function or its forbearance from charging a fee in connection with such a service is not considered a payment of interest." (12 C.F.R. § 217.2(d) (2002).)

Over the years, the Federal Reserve Board has endorsed various arrangements by which banks can provide benefits to depositors without violating the Federal Reserve Act or Regulation Q. Two arrangements are pertinent to this case.

First, a bank can absorb or reduce charges for banking services since the bank does not actually pay funds to the depositor, even though the depositor benefits from the absorption of charges. (12 C.F.R. § 217.2(d) (2002); Fed. Reserve, Staff Opn. Interpreting Reg. Q (Oct. 27, 1978) Fed. Reserve Reg. Service 2-543.) Similarly, a bank can also contract with a third party to provide a "normal banking function" for the depositor if (1) the service is the functional equivalent of provision directly by the bank and (2) provided there is no payment "to or for the account of"[7] the bank's customer. (Fed. Reserve, Staff Opns. Interpreting Reg. Q (Sept. 28, 1993 & Nov. 24, 1993) Fed. Reserve Reg. Service 2-543.1.) However, if the service provider is a wholly owned subsidiary of the demand deposit customer, payments to the

---

[6]Act of December 23, 1913, 38 Statutes at Large 251, chapter 6; see also 12 United States Code section 226.

[7]A payment or credit "to or for the account of" a depositor is an indirect payment of interest. (Fed. Reserve, Staff Opn. Interpreting Reg. Q. (Jan. 3, 1974) Fed. Reserve Reg. Service 2-540.)

service provider would be considered payments "to or for the account of" the customer. (*Ibid.*)

Second, a bank can make loans to its customers at a reduced rate of interest based on earnings credits attributed to compensating balances maintained in demand deposit accounts. The amount of credit the bank would extend would be determined with reference to the historical average demand deposit account balances. Loan proceeds would be used to purchase commercial paper, treasury bills and other investment instruments pledged as security for the loans. (Fed. Reserve, Staff Opns. Interpreting Reg. Q., *supra*, Fed. Reserve Reg. Service 2-540; *id.,* (June 28, 1988) Fed. Reserve Reg. Service 2-545 & 2-545.1.)

## C. *Contested Practices*

The heart and soul of the SAC is that Banks knowingly diverted interest earned on appellants' escrow funds to the title companies through the artifices of earning credits and monthly revolving credit facilities (MRCF's). The key allegations are as follows:

(1) *Earnings Credits*: Earnings credits are credits, expressed in dollars, earned on deposited escrow funds. Banks extended earnings credits to title companies based on the average daily escrow funds on deposit with them, and provided the title companies with monthly account analysis statements setting forth the exact amount of the credits. Ostensibly, these earnings credits were used to pay for normal banking services provided to title companies by Banks or by third party vendors under contract with Banks. In fact, Banks paid earnings credits for services that were not normal banking functions, e.g., invoices were paid for tax preparation; voicemail systems; office supplies and furniture; and installation and upgrading of computer equipment in branch offices (even though the equipment was used primarily for nonescrow services).

Additionally, Banks paid earnings credits for services that were never rendered, based on invoices they knew were not related to normal banking services. Routinely the invoiced amounts were calculated to match and exhaust the available earnings credits. Further, earnings credits went to shell companies that had no independent existence, employees or payroll expenses, based on phony invoices. The shell companies in turn funneled or rebated the payments to the title companies. As well, earnings credits were paid to subsidiaries of the title companies for services invoiced at inflated, above-market rates.

(2) *MRCF's*: The MRCF process works this way: On the last day of each month Banks calculate the amount of credit the title companies are eligible

to borrow. On the first day of the next month they inform the title companies of the net investable balance for the preceding month. With that balance Banks purchase securities for the title companies, selecting the securities from a list in the MRCF contract which includes treasury bills, certificates of deposit, and highly rated commercial paper. Banks charge a nominal amount of interest on the credit extended to the title companies, but the securities generate a market rate of return, guaranteeing monthly profit to the companies.

No later than the last day of each month Banks liquidate the securities. They retain the principal from the sale along with sufficient funds to pay off the nominal interest charged. The remaining "spread" is the interest earned on the securities, which Banks wire transfer to separate accounts controlled by the title companies.

Appellants alleged that the MRCF's resulted in net payments based solely on the amount of funds held in non-interest-bearing escrow accounts and the market interest rates. These payments amounted to rebates paid directly to the title companies, and as such they constituted interest in violation of federal law.

D. *Excessive Fees*

The SAC further asserted that by agreeing to "covertly" pay interest on escrow funds, Banks captured for themselves a larger pool of capital than they could otherwise obtain from title companies, and reaped substantial profits from excessive fees associated with offering and maintaining the escrow accounts. The excessive fees were passed on, directly or indirectly, to consumers.

E. *Causes of Action; Relief*

Appellants pled five causes of action: (1) aiding and abetting conversion of interest; (2) aiding and abetting breach of fiduciary duty; (3) aiding and abetting breach of agent's duties to principal; (4) unjust enrichment; and (5) violation of the unfair competition law (UCL).[8] They sought general and punitive damages, as well as an order "directing restitution of all improperly assessed charges and interest obtained, and the imposition of an equitable constructive trust over such amounts for the benefit of Plaintiff[s], the Class members and the general public . . . ."

F. *Procedural History*

Originally, appellants filed an omnibus complaint naming Banks and six title companies as defendants. The trial court sustained defendants' demurrer

---

[8]Business and Professions Code section 17200 et seq.

on grounds of misjoinder. Thereafter, appellants refiled against the title companies in Los Angeles and against each Bank separately in San Francisco. The Los Angeles County Superior Court sustained the title companies' demurrers without leave to amend as to causes of action for breach of fiduciary duty and agent's duty, negligence, conversion and conspiracy but overruled demurrers to the unjust enrichment causes.

Meanwhile, the trial court ultimately sustained Banks' demurrers to the complaints without leave to amend, reasoning as follows: "I don't believe that there's any allegation of any conduct by any of the Banks that the Banks were not permitted to engage in other than the alleged violation of Regulation Q. If we assume that the Banks did violate Regulation Q, that would mean that they paid title companies moneys that they shouldn't have paid them, that they gave what constituted interest to the title companies based on these demand deposit accounts which they weren't permitted by the federal banking authorities to do. And if that's what they did, that is not something that could possibly have harmed any of the plaintiffs. [¶] . . . [¶] . . . [T]aking [the allegations] at face value and assuming them to be true, they show that the banks were violating Federal Reserve Board restrictions against the payment of interest. But they do not show conduct that aided title companies in keeping from plaintiffs . . . moneys to which those individuals were entitled. Because on the face of it, . . . the money shouldn't have been paid in the first place."

## II. STANDARD OF REVIEW

■ The demurrer tests the legal sufficiency of the complaint. We engage in de novo review of a judgment of dismissal following the sustaining of a demurrer without leave to amend. (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1500-1501 [82 Cal.Rptr.2d 368].) Further, " '[w]e treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' " (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58], quoting *Serrano v. Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].)

## III. DISCUSSION

A. *Appellants Have No Legal Right to Receive Payments from Banks Based on Extension of Benefits to the Title Companies*

1. *Introduction*

■ Appellants seek damages and restitution premised on their legal right to interest allegedly wrongfully paid to the title companies. In order to

recover damages based on diverted interest under any of the tort causes of action, appellants must demonstrate " 'a wrongful invasion by the defendant[s] of some legal right of the plaintiff[s] and damage resulting to the plaintiff[s] from the wrongdoing.' " (*Miller v. Lakeside Village Condominium Assn.* (1991) 1 Cal.App.4th 1611, 1622 [2 Cal.Rptr.2d 796].) For the unjust enrichment claim, there must be "receipt of a benefit and unjust retention of the benefit *at the expense of another.*" (*Lectrodryer v. SeoulBank* (2000) 77 Cal.App.4th 723, 726 [91 Cal.Rptr.2d 881], italics added.) And with respect to a claim under the UCL, the trial court is empowered to "make such orders or judgments . . . as may be necessary to *restore to any person in interest* any money or property, real or personal, which may have been acquired by means of such unfair competition." (Bus. & Prof. Code, § 17203, italics added.) An order for restitution under the UCL compels the "UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 126-127 [96 Cal.Rptr.2d 485, 999 P.2d 718], fn. omitted.) In short, for any of these claims to fly, appellants must have been deprived of something to which they were entitled. Therein lies the problem.

## 2. *No Entitlement*

We assume, for purposes of analysis only, that the benefits the Banks extended to the title companies constituted interest *under California law.* California law defines interest as "the compensation allowed by law or fixed by the parties for the use, or forbearance, or detention of money." (Civ. Code, § 1915.) We also assume, for purposes of analysis only, that appellants are correct that the mechanisms the Banks employed to extend benefits to the title companies, namely earnings credits and MRCF payments, violated federal law. Therefore it was illegal for the Banks to make the payments in the first place.

Under this scenario, not only were the funds tainted in the hands of the title company because payments constituted interest in violation of federal law, but once the title company *retained* the funds they became tainted under state law because of Insurance Code section 12413.5. Thus, the benefits extended were twice stamped illegal: coming in the back door to the title companies and then not going out the front door to appellants.

However, had the title companies *not* retained the unlawful benefits and instead passed them off to appellants as interest, those benefits would have

constituted a windfall because Banks should never have extended them in the first place. So, too, had appellants maintained the demand deposit accounts themselves, they would have no legal right to receive any interest from Banks because of the federal prohibition against paying interest on such accounts. How does anything change when instead it is the title companies which maintain the accounts? Appellants cannot accrue a legal entitlement to interest from Banks based on the title companies' receipt of illegal benefits from Banks.

Taking at face value the allegations that payments of earnings credits and MRCF's violated Regulation Q, what has been described is a closed loop of illegal activity involving only the Banks and the title companies. There is no break in the loop allowing for a purging of the federal illegality that would enable appellants to assert a valid entitlement to the funds as against Banks. The asserted purpose of this closed loop is to unlawfully enable title companies to earn money on escrow accounts in exchange for facilitating the capture of substantial capital by Banks. However wrong this may be, there is no wrongful conduct that Banks inflicted directly on appellants.

Nor is there conduct that Banks engaged in to aid the title companies in depriving appellants of an entitlement. Even the allegation that Banks insisted on adding language to escrow instructions clarifying that the parties acknowledged that escrow funds did not bear interest does not constitute assistance in depriving appellants of anything rightfully theirs. This is just part of the behavior to consummate extending illegal benefits to the title companies. Had a federal regulator blown the whistle on these activities, there would be nothing for the title companies to pass on.

Nonetheless, as between the title companies and their customers, Insurance Code section 12413.5 dictates that the customers have the superior right to any payments made by Banks that constituted interest in violation of Regulation Q. Unless the funds were to be disgorged to Banks, the title companies would be obliged to pass those benefits on to their customers.

3. *Case Law Does Not Aid Appellants*

Appellants first urge that *Abrams v. Crocker-Citizens Nat. Bank* (1974) 41 Cal.App.3d 55 [114 Cal.Rptr. 913] supports their claim that federal law does not shield Banks from liability for interest "wrongfully diverted to the title companies." This is not so.

The disputed factual issue in *Abrams* was whether the parties intended impound funds deposited by borrowers to be held in trust. Overturning

summary judgment, the reviewing court held that assuming the existence of a trust, the bank was not obligated to invest funds for the plaintiffs' benefit, but the plaintiffs might be entitled to an accounting for any gain realized by the bank from the use of trust funds. (*Abrams v. Crocker-Citizens Nat. Bank, supra,* 41 Cal.App.3d at p. 60.) The court also responded to the defendant's contention that federal law prohibited it from paying interest on a demand deposit: "[United States Code] section 371a does not protect a bank from liability for money awarded *as compensation for* its wrongful acts." (*Id.* at p. 61, italics added.) For that proposition, the court cited *Lindley v. Robillard* (1955) 208 Misc. 532 [144 N.Y.S.2d 33]. The *Lindley* court concluded that the bank in question wrongfully withheld escrow deposits from the seller, entitling the seller to judgment in the sum of the escrow deposit *with interest from the date of demand.* (*Id.* at p. 536 [144 N.Y.S.2d at pp. 36-37].) Dismissing the bank's United States Code section 371a argument, the court held that the statute "does not protect defendant bank from liability for the interest awarded as compensation for its wrongful retention, after demand, of money to which the defendant Robillard was legally entitled." (*Lindley v. Robillard, supra,* 208 Misc. at p. 537 [144 N.Y.S.2d at p. 37].)

What *Abrams* and *Lindley* stand for is the proposition that the prohibition against paying interest on demand deposits is separate and apart from a bank's liability for interest awarded *on adjudicated damages.* Appellants miss this distinction, which renders *Abrams* inapposite to their cause.

Appellants further ask us to apply the general rule that one who knowingly aids and abets a fiduciary to make secret profits may be jointly liable with the fiduciary for those profits, citing *People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 919 [132 Cal.Rptr. 767]. First, we point out that the agency of an escrow holder is limited: "[D]espite the general description of an escrow holder as a fiduciary, the obligations of an escrow agent are limited to faithful compliance with the instructions from the principals." (*Romo v. Stewart Title of California* (1995) 35 Cal.App.4th 1609, 1618, fn. 9 [42 Cal.Rptr.2d 414].)

Second, *Bestline* relied on *Fink v. Weisman* (1933) 129 Cal.App. 305 [18 P.2d 961], a case in which the plaintiff *had an underlying entitlement to the profit,* and the wrong was not the practice of earning the profit itself. Rather, the only wrong was the concealment of the profit from the plaintiff. *Fink* involved joint venturers in the purchase of property. Such parties are in a fiduciary relationship to each other and one cannot make secret profits out of the transaction not shared with the other. Those who aid and abet the fiduciary in attaining the secret profits are liable with the fiduciary for same. (*Id.* at pp. 311, 317.) In contrast, here the practice itself that generated a

benefit was allegedly illegal and thus appellants did not have an underlying entitlement to those benefits.

Nor does *Bank of America v. Ryan* (1962) 207 Cal.App.2d 698, 707 [24 Cal.Rptr. 739] aid appellants. There, a former bank executive had accumulated fees, commissions, gratuities and gifts by inducing borrowers to pay him for loan approvals, clearly a violation of his fiduciary duty to the bank. The bank sued *in equity* to impose a constructive trust on those assets. The remedy of a constructive trust as to Banks is not possible because it was the title companies that retained the allegedly illegal interest. In any event, digging deeper into the *Ryan* scenario, had Bank of America instead sued its customers who were involved in the kickback scheme on a theory of aiding and abetting the breach of Ryan's fiduciary duty to the bank, it would have lost. Now the action would sound in tort. We are talking about imposing secondary liability as an aider or abettor of a tort, a civil wrong resulting *in damages*. As against its customers, we know of no theory entitling the bank to damages on account of the illegal bribes with which the customers lined Ryan's pockets.

### 4. *Negotiable Order of Withdrawal Accounts*

Appellants further insist that instead of depositing pooled escrow funds in demand deposit accounts, the title companies could and should have opened negotiable order of withdrawal (NOW) accounts for *individual* plaintiffs. ■ NOW accounts are interest-bearing checking accounts held by *individuals, nonprofit organizations or public entities*, in which the depository institution reserves the right to require at least seven days' written notice prior to withdrawal or transfer of funds. (See 12 C.F.R. § 204.2(b)(3)(ii) (2002); see also 12 U.S.C. § 1832(a).)

This argument goes nowhere because the title companies are not obligated to open up NOW accounts. (See *Hannon v. Western Title Ins. Co.* (1989) 211 Cal.App.3d 1122, 1128 [260 Cal.Rptr. 21] [escrow holder has no duty to deposit funds in interest-bearing account absent instruction to do so].) It is permissible to use demand deposit accounts. Moreover, since for-profit organizations are prohibited from opening NOW accounts, title companies would have to administer two sets of accounts. Finally, a bank's reservation of right to demand seven days' advance notice before withdrawal from a NOW account could complicate consummation of transactions because an escrow must close at a specific time.

### 5. *Defense of Illegality*

Appellants also urge that we consider, by analogy, the limitations which have arisen concerning application of the doctrine of illegality to issues of

contract enforcement. ■ The rule that courts will not aid enforcement of an illegal agreement or one against public policy will be relaxed where the transaction has been completed, no serious moral turpitude is involved, the defendant is guilty of the greater moral fault, and where reliance on the rule would permit the defendant to be unjustly enriched at the plaintiff's expense. (See, e.g., *Norwood v. Judd* (1949) 93 Cal.App.2d 276, 288-289 [209 P.2d 24]; see also *Johnson v. Johnson* (1987) 192 Cal.App.3d 551, 557 [237 Cal.Rptr. 644].) Suffice it to say that issues of contract enforcement as between two parties have little bearing on whether as a matter of law a person has an enforceable right as against a third party. Moreover, the rationale for sidestepping the rule is grounded in the doctrine of unjust enrichment, namely that to deny relief would mean the defendant retains a benefit at the plaintiff's expense. We reiterate, benefits were not paid by Banks or retained by title companies *at appellants' expense.*

For all these reasons, we conclude that appellants cannot state any cause of action based on an entitlement to interest.

B. *Allegations of Excessive Fees Passed on to Appellants Survive Demurrer*

■ We reach a different conclusion as concerns appellants' allegations of unjust enrichment based on Banks charging excessive fees, without justification, for escrow account services that were passed on to them. The SAC alleged that coincident to amassing substantial escrow accounts, Banks charged title companies fees for numerous cash management services described as "account maintenance, account reconciliation, monthly general ledger and financial statements, checks deposited, checks paid, check printing, check sequencing, photocopy and clerical services, facsimile transmission, postage, express mail, incoming and outgoing wire transfers, information and computer services and scores of additional charges for offering and maintaining escrow accounts. Through soliciting title and escrow companies to enter into earnings credits and MRCFs, Defendant[s] obtained ever larger amounts of escrow funds that, in turn, generated more fees." Fees for cash management services were charged at excessive rates, sometimes generating profit margins of nearly 50 percent on some products. These fees were passed on to consumers as higher fees for separate services or higher fees for escrow services generally.

Unlike a claim for damages based on breach of a legal duty, appellants' unjust enrichment claim is grounded in equitable principles of restitution. ■ An individual is required to make restitution when he or she has been unjustly enriched at the expense of another. (Rest., Restitution, § 1, p. 12; *Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 51 [57 Cal.Rptr.2d 687, 924 P.2d

996].) A person is enriched if he or she receives a benefit at another's expense. (Rest., Restitution, § 1, com. a, p. 12; *Ghirardo v. Antonioli, supra,* 14 Cal.4th at p. 51.) The term "benefit" connotes *any* type of advantage. (Rest., Restitution, § 1, com. b, p. 12; *Ghirardo v. Antonioli, supra,* 14 Cal.4th at p. 51.)

 Appellants have stated a valid cause of action for unjust enrichment based on Banks' unjustified charging and retention of excessive fees which the title companies passed through to them. Banks received a financial advantage—excessive fees charged to the title companies—which they unjustly retained at the expense of appellants, who absorbed the overage. To confer a benefit, it is not essential that money be paid directly to the recipient by the party seeking restitution. (*County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1278 [90 Cal.Rptr.2d 41].)

We conclude that appellants' unjust enrichment cause with respect to the alleged overcharges survives demurrer without deciding whether the practices described in the SAC—namely, extension of benefits to title companies through earnings' credits and MRCF's—were illegal under federal law. This equitable claim of unjust enrichment applies regardless of the mechanisms employed by Banks to attract escrow accounts from title companies.

Banks' attempt to assert a defense of federal preemption to this cause of action is misguided. Traditional equitable principles of unjust enrichment do not by any stretch of logic amount to an inconsistent state regulation that interferes with a preeminent federal regulatory scheme. Rather, relief is available under this theory upon a determination that under the circumstances and as between the two individuals, it is unjust for the person receiving the benefit to retain it. (Rest., Restitution, § 1, com. c, p. 13; *First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1663 [15 Cal.Rptr.2d 173].)

### III. Disposition

We affirm in part and reverse in part. Parties to bear their own costs on appeal.

Kay, P. J., and Sepulveda, J., concurred.

A petition for a rehearing was denied April 22, 2003, and the petition of all appellants and respondents for review by the Supreme Court was denied July 23, 2003. Baxter, J., Chin, J., and Brown, J., did not participate therein.