Filed 4/24/14; pub. order 45/6/14 (see end of opn.)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047462 |
| v. | (Super. Ct. No. 30-2009-00125950) |
| HAKIMULLAH SARPAS et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Andrew P. Banks, Judge.  Affirmed and remanded with directions.

Law Offices of Murphy & Eftekhari, Thomas Murphy and Afshin Eftekhari for Defendants and Appellants.

Kamala D. Harris, Attorney General, Frances T. Grunder, Assistant Attorney General, Michele Van Gelderen and Sheldon H. Jaffe, Deputy Attorneys General, for Plaintiff and Respondent.

\*           \*           \*

Hakimullah Sarpas and Zulmai Nazarzai operated a scheme by which they promised customers they would obtain loan modifications from lenders and prevent foreclosure of the customers' homes. They operated this scheme through their jointly owned company, Statewide Financial Group, Inc. (SFGI), which did business as US Homeowners Assistance (USHA). Sharon Fasela[1] was, among other things, the office manager of USHA and came up with the key misrepresentation that USHA had a 97 percent success rate. Customers paid USHA over $2 million but received no services in return. There was no credible evidence that USHA obtained a single loan modification, or provided anything of value, for its customers.

The Attorney General, on behalf of the People of the State of California,[2] commenced this action in July 2009 by filing a complaint against SFGI, USHA, Sarpas, Nazarzai, and Fasela (collectively referred to as Defendants), seeking injunctive relief, restitution, and civil penalties under the California unfair competition law (UCL), Business and Professions Code section 17200 et seq.,[3] and the California False Advertising Law (FAL), section 17500 et seq. Accompanying the complaint were declarations from 19 purported victims. SFGI was placed in receivership on the same day that the complaint was filed.

In July 2012, following a lengthy bench trial, the trial court issued a judgment and a 19-page statement of decision finding against Defendants. The court permanently enjoined USHA, Nazarzai, Sarpas, and Fasela, and ordered restitution be made to every eligible consumer requesting it, up to a maximum amount of

---

[1] Her legal name is Fasela Sheren, but we will use the name by which she was named in the complaint.

[2] We refer to plaintiff and respondent as the Attorney General.

[3] Further code references are to the Business and Professions Code unless otherwise noted.

$2,047,041.86. The court found USHA, Sarpas, and Nazarzai to be jointly and severally liable for the full amount of restitution, and Fasela to be jointly and severally liable with them for up to $147,869 in restitution. The court imposed civil penalties against USHA, Sarpas, and Nazarzai, jointly and severally, in the amount of $2,047,041, and imposed additional civil penalties against Fasela, USHA, Sarpas, and Nazarzai, jointly and severally, in the amount of $360,540.

In this appeal, Sarpas and Fasela challenge the judgment on six discrete grounds of error, each discussed in order in the Discussion section. (SFGI, USHA, and Nazarzai are not parties to this appeal.) As to each ground, we conclude (1) the trial court did not err by issuing a protective order limiting the Attorney General's obligation to respond to thousands of special interrogatories; (2) the trial court did not err by receiving in evidence portions of the deposition transcripts of six USHA customers; (3) the trial court did not err by ordering Sarpas and Fasela to pay restitution; (4) the award and amount of civil penalties against Sarpas are proper, the award of civil penalties against Fasela is proper, but the amount of penalties against her must be recalculated; (5) Sarpas and Fasela were not denied their due process rights to confront and cross-examine witnesses; and (6) the trial court did not err by receiving in evidence checks deposited into USHA's bank account.

Based on these conclusions, we strike the civil penalties awarded against Fasela only and remand for the trial court to recalculate those penalties, but, in all other respects, affirm the judgment.

FACTS

Sarpas was the 50 percent owner of SFGI, which did business as USHA. Nazarzai owned the other 50 percent. Sarpas and Nazarzai each received 50 percent of the company profits. From March 2008 to April 2009, Sarpas received $490,000 in profits from SFGI. Sarpas also served as operations manager of SFGI and oversaw the company's day-to-day operations.

Fasela worked as the office manager of SFGI for about one year, ending in July 2009. USHA paid Fasela $2,746 in 2007, $135,358 in 2008, and $11,611 in 2009.

SFGI, through USHA, purported to offer loan modification services. USHA ran a "boiler room" telemarketing operation in which sales representatives, working in a "pit area," cold-called potential customers to offer assistance with modifying the terms of home loans. In addition, sales representatives were available to receive calls from potential customers, usually people who were returning calls made by USHA sales representatives. SFGI purchased the contact information of potential customers from a "lead-generating company." Every USHA sales representative had a quota of calls to be made based on those leads.

Sales representatives were instructed to tell potential customers: "USHA is a full service loss mitigation and asset preservation company based out of California and we essentially help homeowners throughout the US who have fallen behind on their mortgage payment due to some unfortunate circumstance within their household or maybe a hardship situation, in which case our legal staff will negotiate with their current lender to reduce their overall payment and make it affordable to continue living in their home." A sales representative might tell a potential customer that USHA "works with lenders to get the terms of their client's current mortgage changed by forcing the lender to comply with the new federal program."

The cost of USHA's services varied. The service fee schedule of charges given to sales representatives set a fee of $1,800 for one out-of-state loan; $2,500 for two out-of-state loans; $2,500 for one California loan; and $3,500 for two California loans. Sales representatives were instructed to charge as low as $1,000 for lower income customers with low-balance loans, and up to $4,500 for higher income customers with high balance/high payment loans. Sales representatives also were instructed, "[i]f you see that an out of state lead has money please charge them California fees." Charges had to be paid in advance.

4

To induce potential customers to pay these fees, USHA made various promises, including (1) USHA would obtain a significant reduction in the principal balance of the loan, which would lower the amount of monthly payments; (2) USHA would obtain a reduction in the interest rate on the loan, which would lower the amount of monthly payments; (3) USHA would get the lender to forgive any arrearages; (4) USHA would save the customer from foreclosure; (5) the loan modification process would not take long, from 90 days to eight weeks; (6) USHA would refund the money paid by the customer if it were unable to obtain a loan modification; (7) if USHA obtained a loan modification, the fees paid to USHA would be repaid to the customer by the lender or the government; and (8) USHA was an "*attorney backed company*" with a "legal team" working with it to get loan modifications.

Most striking, USHA represented it had a 97 percent success rate, that it had a success rate of "over 95 percent," or that USHA never had a case in which a loan modification was not approved. Fasela came up with the 97 percent success rate figure "in the beginning." One customer testified the sales representative guaranteed USHA would obtain a loan modification.

In addition, customers were told to stop making their mortgage payments because doing so would make obtaining a loan modification easier. As a result, customers often suffered ruined credit, additional fees, foreclosure proceedings, and even loss of the home USHA had promised to save.

USHA made the representations orally in telephone calls from sales representatives and sometimes in letters purporting to set forth a loan modification proposal. A typical letter would propose (1) a reduction of the principal balance to the current property value, (2) conversion to a fixed rate loan, (3) a reduction of monthly payment, (4) forgiveness of arrearages, and (5) reporting the loan status as current to credit agencies. The letters requested the customer to complete and return forms to "allow us to move aggressively in bringing these challenges to conclusion immediately."

5

USHA routinely sent these letters to customers. Several customers testified they believed the letters reflected what USHA would obtain for them.

These representations were effective. During the 18 months prior to June 30, 2009, USHA took in over $2.22 million. One customer testified, "I was convinced by the—the word of [the USHA sales representative]." Another testified, "[t]he only reason I sent the money in is because he gave me a money back guarantee on that."

After paying USHA's fees, customers would have difficulty reaching anyone at USHA to find out the status of their loan modifications. Telephone calls and e-mails went unanswered; sometimes the customer could not even reach voice mail, and when the customer was able to reach voice mail, the call was not returned When customers did get hold of someone, they might be told USHA was "still negotiating" or the matter was "in the hands of a negotiator."

No credible evidence was presented at trial that USHA ever obtained a loan modification, or did anything of value, for any customer. USHA made no refunds to customers, despite its promises, and despite customer demands. Not only did USHA not have a legal team, it had no attorneys whatsoever working on loan modifications.

The case of Jerry Walton, a disabled man living in Mississippi, is a typical, and telling, example of how USHA operated its scam. Walton, who lives on a disability pension, was cold-called by John Kanpur of USHA. Kanpur told Walton that for a payment of $1,000, USHA would obtain a reduction in the interest rate on his home loan and that he would get his money back if USHA did not get the loan modification. Kanpur also told Walton, who was current on the loan, to stop making payments. As instructed, Walton sent USHA $1,000 and stopped making payments on his home loan. When the lender contacted Walton about missed payments, he directed it to USHA. Jean Lute, who worked as a collector for the lender bank, twice called USHA to inform it that foreclosure proceedings were about to commence and that it was important for USHA to

6

return her call.  No one from USHA called her back.  Walton had to pay about $1,000 in extra costs to save his home from foreclosure, and never received a loan modification or a refund from USHA.

After receiving five complaints from Ohio residents, the consumer protection section of the Ohio Attorney General's Office launched an investigation of USHA.  As part of the investigation, consumer protection investigator Sheila Laverty called USHA and posed as a potential customer.  In the phone call, Laverty said she lived in Columbus, Ohio, was behind on her mortgage payments, and was interested in learning about USHA's services.  A sales representative named Ian told Laverty that due to the Home Affordable Mortgage Program, "banks are now forced to work out loan modifications with borrowers that have a hardship," and that if Laverty qualified, she would get a lowered interest rate and "could get rid of any late payments and second mortgages."  Ian told Laverty that USHA "works with lenders to get the terms of their client's current mortgage changed by forcing the lender to comply with the new federal program," that USHA did "about 200 loan modifications a month," and that USHA worked with a legal team.  The quoted fee for USHA's services was $3,500.

Ian later e-mailed Laverty several documents, including a letter, similar to the one described above, purporting to set forth a loan modification proposal.  Laverty understood the letter as reflecting what USHA was offering to do for its customers.  Also, according to Laverty, USHA had not complied with Ohio law requiring telephone solicitors to register with the Ohio Attorney General's Office.

### DISCUSSION:  PREFACE

Sarpas and Fasela identify six arguments by which they challenge the judgment.  We start by addressing an issue which, though not expressly identified as one of those six arguments, underlies their challenge to the order of restitution and civil penalties.  Only a handful of USHA customers testified at trial, and the deposition

testimony of only six customers was read into evidence. Sarpas and Fasela argue (in the context of other issues) that the amount of restitution and civil penalties must be limited to those witnesses and cannot be ordered for USHA customers whose live testimony was not presented at trial.[4]

Section 17203 authorizes an order of restitution as a remedy for violations of section 17200. In part, section 17203 reads: "The court may make such orders or judgments, . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Section 17535 likewise authorizes an order of restitution for a violation of section 17500. "The restitutionary remedies of section 17203 and 17535 . . . are identical and are construed in the same manner." (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 177, fn. 10.)

"In a suit for violation of the unfair competition law, 'orders for restitution' are those 'compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken . . . .' [Citation.]" (*People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 134 (*Kennedy*).) The trial court has broad discretion to order restitution. (*Cortez v. Purolator Air Filtration Products Co.*, *supra*, 23 Cal.4th at p. 180.)

Restitution under the UCL and FAL may be ordered without individualized proof of harm. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 326 ["'California courts have repeatedly held that relief under the UCL [(including restitution)] is available

---

[4] For example, Sarpas and Fasela argue: "Fasela and Sarpas proceeded to trial believing that sixteen customers would testify adversely about defendants in general, and perhaps, some about them. They entered trial knowing that at one violation per customer, civil penalties were limited to 16 x $2,500 as was restitution, per court order, only 16 consumers could testify against them." They also argue: "Three alleged violations and three only were proven. Even were the award of civil penalties [c]onstitutional . . . , it must be reduced to $7,500."

8

without individualized proof of deception, reliance and injury'"]; *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1255 [restitution under the FAL]; *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal.App.4th 508, 532 (*Fremont Life*) [restitution under the UCL]; *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1288; *Prata v. Superior Court* (2001) 91 Cal.App.4th 1128, 1144; *People v. Toomey* (1984) 157 Cal.App.3d 1, 25-26); see *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267 [the Legislature considered UCL deterrence "so important that it authorized courts to order restitution without individualized proof of deception, reliance, and injury"].)

The defendant in *Fremont Life*, *supra*, 104 Cal.App.4th at page 531, argued that "across-the-board restitution may not be ordered without proof that all consumers were deprived of money or property as a result of an unfair business practice." The Court of Appeal rejected that argument as contradicting California Supreme Court authority and "the rule that restitution under the UCL may be ordered without individualized proof of harm." (*Id.* at pp. 531-532.) The court in *People v. Toomey*, *supra*, 157 Cal.App.3d at pages 25-26, likewise rejected an argument that restitution under the UCL was limited to victims who testified at trial.

Because individualized proof of harm was unnecessary, the Attorney General was not required to present testimony from each and every USHA customer for whom restitution and civil penalties were being sought. Sarpas and Fasela faced no surprise when they walked into trial because the law was settled that restitution and civil penalties under the UCL and FAL could be ordered against them without individualized proof of harm. The Attorney General presented evidence sufficient to support a reasonable inference of deception and harm as to all USHA customers, and, therefore, the restitution and civil penalties as to all USHA customers were lawful.

9

## I.

### The Trial Court Did Not Err by Issuing the Protective Order.

A. *Background*

Sarpas and Fasela argue the trial court erred by issuing a protective order limiting the Attorney General's obligation to respond to thousands of special interrogatories. The trial court did not err by issuing the protective order.

### 1. *First Motions to Compel*

Eleven days after the complaint was filed, Sarpas and Fasela each served the Attorney General with a set of 83 special interrogatories (the first sets of special interrogatories). The first sets of special interrogatories asked generally whether the Attorney General made certain contentions and, if so, to state all facts supporting those contentions. The Attorney General served responses to the first sets of special interrogatories in September 2009. The responses in total were about 400 pages.

Sarpas and Fasela each brought a motion to compel further responses to every interrogatory of the first sets of special interrogatories (the first motions to compel). In April 2010, the trial court denied the first motions to compel, stating in a minute order: "Plaintiff . . . was proper in its Responses. Plaintiff can only provide and only need[] provide the information that it has at the time it responds to particular discovery. Plaintiff apparently did this here with as much specificity to a particular Defendant as the information it had would allow. The objections that Plaintiff made were proper and were not tested by the Motions Defendants brought, in any event. As time goes on, supplemental discovery may well develop more particularized responses as to some of the defendants, victims, dates etc."

### 2. *Second Motions to Compel*

On the same day that the trial court denied the first motions to compel, Sarpas and Fasela propounded a request for supplemental responses to the first sets of

special interrogatories.  The Attorney General served responses totaling about 900 pages, accompanied by five exhibits.  On June 17, 2010, after discussion between counsel about the responses, the Attorney General served supplemental responses.

Sarpas and Fasela each brought a motion to compel further responses to the request for supplemental responses (the second motions to compel).  They argued:  "Time and again, Plaintiff provides an evasive and generalized response that totally fails to answer the question posed.  After reading and reviewing each response, no individual Defendant has any inkling of what specifically it, he or she allegedly did, to whom, or when.  The only information provided is a generalized and sweeping summary of the charges set forth in the Complaint.  In this discovery, Defendants sought specific information as to what, where, when, and to whom they each, individually, allegedly did wrong.  Absent proper responses, Defendants cannot possibly defend themselves against the generalized allegations brought."

3. *Second Sets of Special Interrogatories*

In the responses to the first sets of special interrogatories, the Attorney General identified hundreds of USHA customers, including 585 customers identified by the court-appointed receiver.  In June 2010, each Defendant served a second set of special interrogatories (the second sets of special interrogatories) propounding eight interrogatories for every one of about 550 of the USHA customers identified by the Attorney General.[5]

---

[5]  The eight interrogatories were:

"1.  As to [name of USHA customer], do you contend that this propounding party violated any Code(s)/Statute(s)?

"2.  As to [name of USHA customer], if you contend that propounding party violated any Code(s)/Statute(s), set forth the Code(s)/Statute(s) allegedly Violated.

"3.  As to [name of USHA customer], if you contend that propounding party violated any Code(s)/Statute(s), and for each alleged violation, describe in detail all conduct allegedly committed.

"4.  As to [name of USHA customer], if you contend that propounding party violated any Code(s)/Statute(s), and for each alleged violation, state the date of each violation.

11

In February 2011, each Defendant served a third set of special interrogatories, with each set containing 1,248 interrogatories. Each set propounded the same eight questions from the second sets of special interrogatories in regard to about 156 USHA customers. About 5,328 questions in these third sets of special interrogatories were directed to the USHA customers who were also the subject of the second sets of special interrogatories. In March 2011, each Defendant served a fourth set of special interrogatories, with each set containing 400 questions.

4. *Motion for Protective Order*

In March 2011, the Attorney General filed a motion for a protective order "that Plaintiff need not respond to Defendants' second and third sets of special interrogatories." In the motion, the Attorney General argued: "[T]hese interrogatories reflect a fundamental misunderstanding of what the People need to prove at trial to prevail on their claims, and what the People are obligated to provide in discovery. The People are not obligated to prove each and every specific individual harm suffered by every one of the hundreds of victims of Defendants' illegal acts. If that were the case, the People would be required to bring to Court the hundreds of victims as part of a multi-year trial. Rather, the People will establish that Defendants or those acting under their direction engaged in a pattern of illegal and deceitful behavior. While some victims will be called, the case will largely be based upon expert testimony, deposition testimony

---

"5. As to [name of USHA customer], if you contend that propounding party violated any Code(s)/Statute(s), and for each alleged violation, describe in detail the damages allegedly suffered.

"6. As to [name of USHA customer], if you contend that propounding party violated any Code(s)/Statute(s), and for each alleged violation, set forth all facts which support your contention.

"7. As to [name of USHA customer] what fact(s) specific to this propounding party does this individual possess as a potential witness?

"8. As to [name of USHA customer] if you contend that this propounding party owes restitution, set forth the amount allegedly owed."

12

(including the Depositions of Defendants), employee testimony, and Defendants' own admissions and documents."

5. *The Trial Court's Order*

On April 1, 2011, following a hearing, the trial court issued a minute order denying the second motions to compel. The order stated: "Defendants have failed to show a reasonable and good faith attempt at meeting and conferring on the issues presented by these Motions. In addition, the motions failed to comply with applicable rules regarding Separate Statements."

The trial court granted the Attorney General's motion for a protective order. The order stated: "1. Plaintiff is only required to respon[d] to each Defendants' second and third set of special interrogatories as they pertain to those individuals Plaintiff anticipates will be called at trial; [¶] 2. As to the individuals Plaintiff does not anticipate calling at trial, Plaintiff is to (a) specifically state that it will not call those individuals, or (b) provide a specific date by which it will make the determination and then answer those interrogatories within 30 days of that date either stating that the particular individual will not be called or providing the requested information." The court ordered the Attorney General to provide to Defendants' counsel, by May 16, 2011, a list of those persons whom the Attorney General intended to call at trial, to provide additional names by June 16, and to serve interrogatory responses as to any additional names provided by July 16.

B. *Standard of Review*

The standard of review for a discovery order is abuse of discretion. (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 733.) We also review an order granting or denying a motion for a discovery-related protective order under the abuse of discretion standard. (*Liberty Mutual Ins. Co. v. Superior Court* (1992) 10 Cal.App.4th 1282, 1286-1287.)

13

The abuse of discretion standard has been described generally in these terms: "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478.) Under the abuse of discretion standard, "[w]here there is a [legal] basis for the trial court's ruling and it is supported by the evidence, a reviewing court will not substitute its opinion for that of the trial court." (*Lipton v. Superior Court* (1996) 48 Cal.App.4th 1599, 1612.)

C. *The Trial Court Did Not Abuse Its Discretion.*

The legal basis for the protective order issued by the trial court is Code of Civil Procedure section 2030.090: "When interrogatories have been propounded, the responding party, and any other party or affected natural person or organization may promptly move for a protective order. . . ." (Code Civ. Proc., § 2030.090, subd. (a).) "The court, for good cause shown, may make any order that justice requires to protect any party or other natural person or organization from unwarranted annoyance, embarrassment, or oppression, or undue burden and expense." (*Id.*, § 2030.090, subd. (b).) A protective order may include the direction that "the set of interrogatories, or particular interrogatories in the set, need not be answered," "the response be made only on specified terms and conditions," or "the method of discovery be an oral deposition instead of interrogatories to a party." (*Id.*, § 2030.090, subd. (b)(1), (4), & (5).)

"Oppression" means the ultimate effect of the burden of responding to the discovery is "incommensurate with the result sought." (*West Pico Furniture Co. v. Superior Court* (1961) 56 Cal.2d 407, 417.) In considering whether the discovery is unduly burdensome or expensive, the court takes into account "the needs of the case, the amount in controversy, and the importance of the issues at stake in the litigation." (Code Civ. Proc., § 2019.030, subd. (a)(2).)

Substantial evidence supported findings the second sets of special interrogatories and third sets of special interrogatories were unwarrantedly oppressive, or unduly burdensome or expensive. Each of the second sets of special interrogatories

14

propounded about 4,400 interrogatories, and each of the third sets of interrogatories propounded 1,248 interrogatories. Over 5,300 interrogatories propounded in the third sets of interrogatories were duplicative of interrogatories propounded in the second sets of special interrogatories. The needs of the case did not warrant all of the interrogatories because, as we have explained, individualized proof of harm is not required for restitution under the UCL. (*Fremont Life*, *supra*, 104 Cal.App.4th at p. 532.) Thus, for example, the basis for and the amounts of individual claims of restitution were unnecessary for defending the claims at trial.

Much of the information sought by the interrogatories had already been provided or could be obtained by other means. Attached to the complaint were declarations from 19 USHA customers. The complaint and the declarations disclosed the Attorney General was asserting violations of sections 17200 and 17500, and described the conduct forming the basis for the alleged violations. In interrogatory responses, the Attorney General provided Sarpas and Fasela with the names and addresses of 585 USHA customers. Sarpas and Fasela had the opportunity to interview, depose, or subpoena to testify at trial, any or all of those USHA customers, if Sarpas and Fasela had wanted to do so. As the trial court explained, "if [the deputy attorney general]'s given you the names of everybody else, you can incur the costs and effort to find out if any of them have good things to say . . . . Because it appears to me it is an undue burden for them to go beyond giving you everybody's name and, if they've got statements from those people, copies of their statements."

In opposing the Attorney General's ex parte application for an order extending the time to answer interrogatories, counsel for Sarpas and Fasela stated, "we're really not interested in [the deputy attorney general] answering all these interrogatories unless he's intending to bring these people to trial." The trial court gave Sarpas and Fasela what they wanted by directing the Attorney General to answer the interrogatories related to those USHA customers whom the Attorney General intended to call as

15

witnesses to testify at trial. The trial court did not abuse its discretion by issuing the protective order.

Finally, Sarpas and Fasela state in the heading under "Ground 1," on page 9 of their opening brief, that the trial court abused its discretion "in denying appellants' motion to compel." (Boldface & some capitalization omitted.) Although Sarpas and Fasela argue generally they were entitled to the information sought by the special interrogatories, they never specifically address the first motions to compel, the second motions to compel, or the grounds on which the trial court denied those motions. The trial court denied the first motions to compel because the Attorney General had provided all information known at the time the first sets of special interrogatories were propounded. The trial court denied the second motions to compel because Defendants had not shown a reasonable and good faith attempt at meeting and conferring and because the motions failed to comply with the applicable rules regarding separate statements. We find no abuse of discretion in the trial court's rulings.

## II.

### The Trial Court Did Not Err by Receiving in Evidence Deposition Testimony of USHA Customers.

A. *Introduction*

Sarpas and Fasela contend the trial court erred by receiving in evidence portions of the deposition transcripts of six USHA customers for whom the Attorney General did not provide interrogatory responses. The excerpts came from properly noticed depositions of witnesses who lived more than 150 miles from the courtroom. (Code Civ. Proc., § 2025.620, subd. (c)(1).) Sarpas and Fasela do not contend otherwise. They argue instead that receipt in evidence of portions of the deposition transcripts violated the terms of the protective order, which required the Attorney General to provide

16

interrogatory responses to those USHA customers who "Plaintiff anticipates will be called at trial."

After the trial court issued the protective order, the Attorney General answered the second sets of special interrogatories and the third sets of special interrogatories as to 16 USHA customers. Of these 16, the Attorney General called five to testify at trial. In addition, the trial court received in evidence portions of the deposition transcripts of six USHA customers[6] for whom the Attorney General had not provided interrogatory responses. Defendants objected on the ground that use of the deposition transcripts at trial violated the terms of the protective order. At the outset of trial, they had filed a motion in limine to exclude testimony from any USHA customer for whom interrogatory responses had not been served.

Overruling the objection, the trial court stated: "There's no surprise when you set a person's depo[sition]. . . . [I]n the court's mind that is the functional equivalent of the notice to the other side about what—who you're going to call. And because you're deposing them live, you're hearing the questions, and there's just no prejudice. [¶] . . . [I]f the defendants then wanted to have interrogatories directed to those people whose deposition was taken on these eight issues . . . , then they could have . . . . [¶] The idea that only the people identified in those interrogatories and not people whose deposition you noticed could be called at trial just isn't correct. I . . . don't see any prejudice. Everybody gets equal access to the person and the potential for their testimony to be used at trial."

The trial court also received in evidence portions of the deposition transcripts of bank collector Lute and investigator Laverty. Defendants did not object to Laverty's deposition transcript.

---

[6] They were: Jerry Walton, Cheryl Hollis, Edith Johnson, John Otero, Larry Lee, and Brenda Miller.

17

B. *The Trial Court Did Not Abuse Its Discretion.*

Trial court rulings on the admissibility of evidence, whether made in limine or during trial, are usually reviewed under the abuse of discretion standard. (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)

Whether the trial court erred by receiving in evidence the deposition transcripts of the six USHA customers depends on the meaning of the protective order. As relevant to this issue, it stated: "Plaintiff is only required to respon[d] to each Defendants' second and third set of special interrogatories as they pertain to those individuals Plaintiff anticipates *will be called at trial.*" (Italics added.)

The Attorney General argues the italicized phrase refers only to those witnesses who were to be called to provide live testimony at trial. We agree. That is the plain meaning of the term "called at trial." When a deposition transcript is read or offered in evidence at trial in lieu of live testimony the deponent is not being "called at trial."

This meaning is consistent with the Code of Civil Procedure which, in describing the modes of taking witness testimony, distinguishes between a deposition ("a written declaration, under oath, made upon notice to the adverse party, for the purpose of enabling him to attend and cross-examine") and oral examination testimony ("an examination in presence of the jury or tribunal which is to decide the fact or act upon it, the testimony being heard by the jury or tribunal from the lips of the witness"). (Code Civ. Proc., §§ 2004, 2005.) A deponent is noticed or subpoenaed to testify outside the presence of the trier of fact. (*Id.*, §§ 2025.010, 2025.210, 2025.250, 2025.280, 2025.320.) In describing how a subpoena may be obtained, the Code of Civil Procedure distinguishes between using a subpoena "[t]o require attendance before a court, or at the trial of an issue therein" and "[t]o require attendance out of court . . . before a judge, justice, or other officer authorized to administer oaths or take testimony." (*Id.*, § 1986, subds. (a) & (c).) The Code of Civil Procedure refers to the "use" of a deposition at trial,

18

refs to the "deponent" rather than the witness, and, in describing the situations in which the deponent is unable to testify, refers to the deponent's inability "to attend or testify," the inability "to compel the deponent's attendance," and the inability "to procure the deponent's attendance." (*Id.*, § 2025.620, subds. (a), (b), (c)(2)(C), (D), & (E).) In sum, the Code of Civil Procedure consistently distinguishes between testimony of a deponent obtained by deposition and testimony by a witness at trial, and between attendance at a deposition and attendance at trial.

The Attorney General points out that at the hearing on the protective order motion, the trial court, after hearing the Attorney General's proposal about identifying witnesses, stated, "[o]kay. So that would take care of live witnesses." Later at the same hearing, the trial court stated it wanted the Attorney General only "to turn over the answers to interrogatories as to the people he intends to call at trial." These comments by the trial court support the interpretation of the protective order as requiring the Attorney General to respond to interrogatories only for persons whom the Attorney General anticipated calling to provide live testimony at trial.

Even if the protective order could be construed as requiring the Attorney General to provide interrogatory responses for the six USHA customers whose deposition transcripts were used at trial, Sarpas and Fasela can show no prejudice. As the trial court commented, the depositions were properly noticed, and counsel for Defendants could have attended them and cross-examined the witnesses.

Sarpas and Fasela argue their counsel made a calculated decision not to attend the depositions because "each such deponent was outside of the protective order issued by the Court, rendering any such participation a waste of time." Sarpas and Fasela cite to nothing in the record to show their counsel tried to clarify the meaning of the protective order or confirm their interpretation of it was correct. The argument that participation in the depositions would have been a waste of time is unconvincing. Sarpas and Fasela argue some witnesses "did little to support [the Attorney General]'s case,"

19

and, by participating in the depositions, their counsel might have uncovered more unfavorable testimony to use in their defense.  To lower costs, counsel could have attended the depositions by telephone.  (Code Civ. Proc., § 2025.310, subd. (a).)

Sarpas and Fasela's reliance on *Thoren v. Johnston & Washer* (1972) 29 Cal.App.3d 270 is misplaced, for in that case the plaintiff deliberately excluded the name of a potential witness from interrogatory responses.  The appellate court held that the trial court did not abuse its discretion by barring the plaintiff from calling that witness from testifying at trial.  (*Id*. at p. 275.)  The issue in this case is the meaning of the protective order, i.e., whether the phrase "individuals Plaintiff anticipates will be called at trial" includes deponents whose deposition transcripts the Attorney General used at trial.  The names of all the deponents whose deposition transcripts were used at trial were disclosed in interrogatory responses and by the notices of deposition.

Sarpas and Fasela also argue the trial court erred by receiving in evidence portions of the deposition transcripts of Lute and Laverty.  Lute was not a USHA customer, was not a subject of the special interrogatories, and, therefore, her testimony was not subject to the protective order.  Sarpas and Fasela did not object to Laverty's deposition transcript and thereby forfeited any challenge to its admission.  (Evid. Code, § 353, subd. (a).)

Sarpas and Fasela state there was "neither legal rhyme nor reason" why the trial court excluded one of their witnesses on the ground they did not identify the witness in interrogatory responses, yet allowed the Attorney General to use the six deposition transcripts "in violation of both the Discovery Act and the Protective Order."  The only explanation for this result, Sarpas and Fasela assert, is judicial bias.  Accusations of judicial bias are serious, and we treat them as such.  Our review of the record leads us to categorically reject these accusations of bias.  As we have explained, the trial court did not err by allowing the Attorney General to use the deposition transcripts, one of which was not covered by the protective order, and another of which was used without

20

objection. There is not so much as a hint of judicial bias from the trial judge, who presided in a fair and exemplary manner over a difficult case.


## III.

### The Trial Court Did Not Err by Ordering Sarpas and Fasela to Pay Restitution.

A. *Introduction*

Based on findings that Defendants violated sections 17200 and 17500, the trial court ordered USHA, Sarpas, and Nazarzai, jointly and severally, "to offer and make restitution to each and every customer, client or person who paid a fee for loan modification services to USHA . . . , during the period beginning January 1, 2008 through and including July 14, 2009 and who requests restitution in response to the offer." The court determined the maximum amount of restitution to be $2,047,041.86. Of that amount, Fasela was found to be jointly and severally liable for up to $147,869.

Sarpas and Fasela challenge the restitution order on two grounds. First, they argue they cannot be ordered to pay restitution because neither of them received funds directly from USHA customers. Second, they argue the evidence was insufficient to establish either actively participated in, or aided and abetted, a scheme to deceive.

B. *Restitution Is Not Limited to Direct Payment from Victims.*

Relying on *Bradstreet v. Wong* (2008) 161 Cal.App.4th 1440 (*Bradstreet*), Sarpas and Fasela argue they cannot be ordered to pay restitution absent evidence either one received money directly from USHA customers. Although the trial court found that USHA received over $2 million from customers, Sarpas and Fasela argue neither of them personally received money directly, and "[l]egally, under California law, a defendant who has violated the UCL, cannot be made to restore to a consumer that which he or she never *directly* received from the consumer." (Italics added.) This argument is legally incorrect.

21

In *Bradstreet*, the California Labor Commissioner filed a complaint against the shareholders, officers, and directors of several garment manufacturing corporations, seeking to hold them personally liable for the corporations' failure to pay employee wages. (*Bradstreet*, *supra*, 161 Cal.App.4th at p. 1444.) The complaint alleged the failure to pay wages constituted violations of the Labor Code and sought relief from the defendants personally on the ground they came within the relevant definition of employer. (*Id.* at p. 1446.) A private association and two former employees were permitted to file a complaint in intervention alleging violations of section 17200 and seeking restitution from the defendants personally. (*Bradstreet*, *supra*, at pp. 1444, 1446.)

The trial court found the common law definition of the word "employer" applied to the Labor Code violations alleged, the defendants were not employers under that definition, and, therefore, the defendants were not personally liable for the unpaid wages. (*Bradstreet, supra,* 161 Cal.App.4th at p. 1447.) The court found the plaintiff had failed to prove the defendants were the alter egos of the corporations. (*Ibid.*) On the section 17200 cause of action, the trial court found "an order requiring defendants to pay the wages owed by the . . . Corporations, was not an available remedy in a private action under the UCL, because defendants had not personally obtained any money or property from the plaintiffs." (*Id.* at p. 1448.)

The Court of Appeal affirmed. On the Labor Code violations, the court stated: "The issue is whether defendants, as the shareholders, officers, or managing agents of the . . . Corporations, may be held personally liable for the many violations of the Labor Code that occurred when these employees were not paid, and the corporations went out of business." (*Bradstreet*, *supra*, 161 Cal.App.4th at p. 1449.) After addressing relevant authority, the court concluded the common law definition of the word "employer" applied to the Labor Code provisions the defendants allegedly violated and,

22

under that definition, only the corporations, not the shareholders, officers, and directors, were the employers. (*Id.* at p. 1454.)

On the section 17200 violations, the Court of Appeal stated, "[a]lthough it is well established that an owner or officer of a corporation may be individually liable under the UCL if he or she actively and directly participates in the unfair business practice, it does not necessarily follow that all of the remedies imposed with respect to the corporation are equally applicable to the individual." (*Bradstreet*, *supra*, 161 Cal.App.4th at p. 1458.) If the defendants had directly and actively participated in an unfair business practice, there would be no dispute that they would be subject to civil penalties in a public action and that unpaid wages could be recovered as restitution from the corporations. (*Id.* at p. 1459.) "The issue in the case before us," the court stated, "is whether these defendants, who were *not* the employers, and who were not found to have required any employee to work for them personally, or to have misappropriated corporate funds for their own use, may also be required to pay the earned but unpaid wages as restitution." (*Ibid.*)

The Court of Appeal concluded the defendants could not be held liable for restitution because the interveners did not perform labor for them personally: "In the absence of a finding that intervener performed labor for defendants personally, rather than for the benefit of [the] Corporations, or that defendants appropriated for themselves corporate funds that otherwise would have been used to pay the unpaid wages, we agree with the trial court's conclusion that an order requiring defendants to pay the unpaid wages would not be 'restitutionary as it would not replace any money or property that defendants took directly from' intervener." (*Bradstreet*, *supra*, 161 Cal.App.4th at p. 1460.) The court distinguished cases cited by the interveners on the ground that "none addresses the question whether the corporate officer or owner could be directed to return money or property to the plaintiff that the corporation had obtained through an unfair

23

practice, but that the individual defendant had not personally obtained or misappropriated." (*Id.* at p. 1461.)

Here, the parties argue at length over whether *Bradstreet* is an "employment" case or a UCL case, whether *Bradstreet* remains good law, whether it was wrongly decided, and whether it is distinguishable. The trial court in this case concluded *Bradstreet* "is an employment case based on a narrow employment-law doctrine since abrogated by the California Supreme Court." *Bradstreet* is, however, both an "employment" case and a UCL case. *Bradstreet* addressed two distinct issues, one being the definition of employer for purposes of the alleged Labor Code violations, and the other being whether the defendants could be personally liable for restitution under the UCL. In *Martinez v. Combs* (2010) 49 Cal.4th 35, 50, footnote 12, the California Supreme Court abrogated *Bradstreet* only on its definition of "employer" under the relevant Labor Code section.

Whether or not *Bradstreet* is a UCL case or remains good law on the issue of restitution under the UCL ultimately is beside the point. We are not bound by *Bradstreet* (*Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1193 ["there is no horizontal stare decisis in the California Court of Appeal"]), and the case does not support Sarpas and Fasela's position that restitution under the UCL and FAL is available only from those who receive money *directly* from the victims of the fraudulent, unlawful, or unfair practice. Significant to the reasoning of the Court of Appeal in *Bradstreet* was the lack of evidence the defendants in that case had misappropriated corporate funds that otherwise would have been used to pay wages. (*Bradstreet*, *supra*, 161 Cal.App.4th at p. 1460.) Under this reasoning, the defendants might have been held liable for restitution if they had indirectly benefitted from the failure to pay wages.

In support of the argument they cannot be liable for restitution, Sarpas and Fasela also rely on the following passage from *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1149 (*Korea Supply*): "Any award that plaintiff would

24

recover from defendants would not be restitutionary as it would not replace any money or property that defendants took *directly* from plaintiff." (Italics added.) Several cases explain why Sarpas and Fasela's reliance on this passage is misplaced and illustrate how, in particular circumstances, restitution under the UCL and FAL is available from those who did not receive money directly from the victims of the fraudulent, unlawful, or unfair practice. We next analyze each of these cases. All of them support restitution to the victims in this case.

The trial court in *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1314-1315, 1340 (*Troyk*), ordered the defendants, an insurance company and its corporate attorney in fact, to pay restitution under the UCL for unlawful service charges paid by the class members to a billing company. On appeal, the defendants argued they could not be ordered to pay restitution because the service charges were paid directly to the billing company, not to them. (*Troyk*, *supra*, at p. 1338.) The defendants cited the same passage from *Korea Supply*, *supra*, 29 Cal.4th at page 1149, on which Sarpas and Fasela rely. (*Troyk*, *supra*, at p. 1338.)

The Court of Appeal in *Troyk* rejected the defendants' interpretation of *Korea Supply* because "that language was parsed from the facts and analysis in that case, which involved money in which the plaintiff never had a vested interest and for which the plaintiff, in effect, sought disgorgement, rather than restitution, from the defendant." (*Troyk*, *supra*, 171 Cal.App.4th at p. 1338.) The *Troyk* court concluded *Korea Supply* was inapposite and "does *not* hold that a plaintiff who paid a third party money (i.e., money in which the plaintiff had a vested interest) may not seek UCL restitution from a defendant whose unlawful business practice caused the plaintiff to pay that money." (*Troyk*, *supra*, at p. 1338.) After reviewing California Supreme Court and Court of Appeal decisions, the *Troyk* court stated: "Accordingly, case law does not support [the defendant]s' argument that they cannot be liable for restitution under the UCL because

25

[the billing company], rather than [the defendants], was the direct recipient of the service charges." (*Id.* at p. 1340.)

In *Shersher v. Superior Court* (2007) 154 Cal.App.4th 1491, 1494-1495, the plaintiff sought restitution under the UCL from defendant Microsoft Corporation for a product he purchased from a retailer. Relying on *Korea Supply*, the trial court granted Microsoft Corporation's motion to strike the prayer for restitution on the ground restitution under the UCL was limited to direct purchasers and excluded those who purchased products from a retailer. (*Shersher v. Superior Court*, *supra*, at p. 1494.) The Court of Appeal issued a writ of mandate to overturn that ruling. The Court of Appeal concluded: "[The] respondent court's ruling went beyond the holding in *Korea Supply*, which was that an individual private plaintiff in a tort action may not invoke the court's equitable power under the UCL to seek the return of money or property in which the plaintiff never had an ownership interest. Nothing in *Korea Supply* conditions the recovery of restitution on the plaintiff having made direct payments to a defendant who is alleged to have engaged in false advertising or unlawful practices under the UCL." (*Ibid.*)

The plaintiffs in *Hirsch v. Bank of America* (2003) 107 Cal.App.4th 708, 712 (*Hirsch*), were property owners who, in the course of completing real estate transactions, deposited money with escrow and title companies, which in turn deposited the plaintiffs' funds in demand deposit accounts with the defendant banks. Although federal law prohibited the banks from paying interest on demand deposit accounts, the banks could reward large depositors through other lawful means, including "earning credits" or the purchase of "monthly revolving credit facilities." (*Id.* at pp. 713-715.) The plaintiffs alleged those forms of reward were disguised interest payments and should have been paid to the plaintiffs rather than to the escrow and title companies. (*Id.* at pp. 714-715.) In addition, the banks charged the escrow and title companies a variety of fees to service the demand deposit accounts, and those fees were "passed on to

26

consumers as higher fees for separate services or higher fees for escrow services generally." (*Id.* at p. 721.)

The Court of Appeal held the plaintiffs could not recover the "interest" payments as restitution because they would not have been entitled to interest in the first place. (*Hirsch*, *supra*, 107 Cal.App.4th at pp. 712, 717-718, 721.) But, the court held, the plaintiffs had "stated a valid cause of action for unjust enrichment based on [the] Banks' unjustified charging and retention of excessive fees which the title companies passed through to them. [The] Banks received a financial advantage—excessive fees charged to the title companies—which they unjustly retained at the expense of [the plaintiffs], who absorbed the overage. To confer a benefit, it is not essential that money be paid directly to the recipient by the party seeking restitution. [Citation.]" (*Id.* at p. 722.) The plaintiffs were entitled to relief under the traditional equitable principles of unjust enrichment, "upon a determination that under the circumstances and as between the two individuals, it is unjust for the person receiving the benefit to retain it. [Citations.]" (*Ibid.*)

Thus, "it is not essential that money be paid directly to [Defendants] by the party seeking restitution." (*Hirsch*, *supra*, 107 Cal.App.4th at p. 722.) Sarpas and Fasela received money indirectly from customers by having them pay USHA. The customers parted with property in which they had an ownership interest and are entitled to its return. The rule urged by Sarpas and Fasela would allow UCL and FAL violators to escape restitution by structuring their schemes to avoid receiving direct payment from their victims.

Sarpas and Fasela argue that, if Sarpas can be ordered to pay restitution, his share of restitution must be limited to the net profits he received from USHA. We disagree. "Where restitution is ordered as a means of redressing a statutory violation, the courts are not concerned with restoring the violator to the status quo ante. The focus instead is on the victim. 'The status quo ante to be achieved by the restitution order was

27

to again place the *victim* in possession of that money.' [Citation.] 'The object of [statutory] restitution is to restore the status quo by returning to the *plaintiff* funds in which he or she has an ownership interest.' [Citation.]" (*Kennedy*, *supra*, 111 Cal.App.4th at pp. 134-135.) The evidence was sufficient to support findings that Sarpas violated the UCL and FAL, and, as a result, customers were fraudulently induced to make payments to USHA, which was owned by Sarpas and Nazarzai, for loan modification services they never received. As a remedy for those violations, Sarpas must restore money wrongfully taken from USHA customers to restore them to the status quo ante.

In distinguishing *Bradstreet*, the trial court found that Sarpas and Nazarzai "drained substantial amounts of money from the corporation" and there was no evidence that either of them put funds into the corporation. Sarpas and Fasela do not challenge those findings. Based on those findings and the evidence presented at trial, the trial court could exercise its equitable discretion to conclude USHA, Sarpas, and Nazarzai acted as a single enterprise for the purpose of ordering restitution under the UCL and the FAL. (*Troyk*, *supra*, 171 Cal.App.4th at pp. 1340, 1343.)

C. *The Evidence Was Sufficient to Establish Sarpas and Fasela Violated the UCL and FAL.*

Sarpas and Fasela argue the evidence was insufficient to establish either one actively participated in, or aided and abetted, a scheme to deceive in violation of section 17200 or 17500. Liability under the UCL and FAL must be based on the defendant's participation in or control over the unlawful practices found to violate section 17200 or 17500. (*Emery v. Visa Internat. Service Assn.* (2002) 95 Cal.App.4th 952, 960.) Although a UCL claim cannot be predicated on vicarious liability (*Emery v. Visa Internat. Service Assn.*, *supra*, at p. 960), liability under the UCL may be imposed against those who aid and abet the violation (*Schulz v. Neovi Data Corp.* (2007) 152 Cal.App.4th 86, 88, 93). Liability may be imposed if the defendant ""'knows the other's conduct constitutes a breach . . . and gives substantial assistance or encouragement to the

28

other to so act.""" (*Schulz v. Neovi Data Corp.*, *supra*, at p. 93; see *People v. Toomey*, *supra*, 157 Cal.App.3d at p. 15 ["if the evidence establishes defendant's participation in the unlawful practices, either directly or by aiding and abetting the principal, liability under sections 17200 and 17500 can be imposed"].)

Sarpas and Fasela argue the evidence at trial showed only that Sarpas was an owner and manager of SFGI and USHA and failed to show "any active involvement or participation on his part whatsoever." The trial court found otherwise: "The evidence at trial established that Sarpas and Nazarzai were each active participants in the day-to-day operations of USHA, managed the business, jointly owned USHA, and split the profits from USHA. They are thus directly liable for the actions of the company and liable for their failure to present the deceptive, illegal, and unfair acts of their agents, independent contractors, and employees. Substantial evidence also established that Sarpas and Nazarzai aided and abetted each other, [Fasela], and other employees, independent contractors, and agents of USHA in the violation of the UCL and the FAL."

Sarpas testified at his deposition, portions of which were read into the record at trial, he formed SFGI in 2005, was a 50 percent owner of SFGI, and, starting in 2005, served as its operations manager. In that capacity, he ran and "oversaw" the company's day-to-day operations. When, in 2008, SFGI started the loan modification business through USHA, Sarpas was "there pretty much every day," kept track of what was going on, and continued to manage the company. Sarpas and Nazarzai split the profits from SFGI. Nazarzai testified at his deposition that "[Sarpas] was in charge of every particular department like some of the processing department managers and things like that."

This evidence supported the trial court's findings and is sufficient to impose liability against Sarpas under the UCL and FAL. An analogous case is *People v. First Federal Credit Corp.* (2002) 104 Cal.App.4th 721 (*First Federal*). There, one of the defendants, Ida Lee Hansen, argued the finding she violated section 17500 was not

29

supported by substantial evidence as her role was merely as a notary, office manager, and receptionist for the defendant company. (*First Federal*, *supra*, at pp. 734-735.) The Court of Appeal rejected that argument because the evidence showed that Hansen was one of the two principals of the company, in a position of control over daily operations, and aware of the company's unlawful practices. (*Ibid.*) "In view of Hansen's position as one of the two principals of First Federal, she was in a position of control, yet permitted the unlawful practices to continue despite her knowledge thereof." (*Ibid.*)

Sarpas, like Hansen in *First Federal*, tries to downplay his role in the unlawful practices. But Sarpas formed SFGI, was one of the two principals of SFGI, split its profits with Nazarzai, and, as operations manager, was in a position of control over its daily operations. Sarpas was in a position of control and permitted the known unlawful practices to continue.

Sarpas and Fasela argue that, with the exception of three potential violations, liability against Fasela was predicated entirely on vicarious liability. Sarpas and Fasela argue no evidence was presented to show Fasela participated in or aided and abetted UCL violations by others.

The trial court found: "The evidence at the trial established that [Fasela] was an active participant in the violations of the UCL and FAL. She was the office manager and sales manager and held a number of other roles at the company. She had been a key player in USHA's loan modification business from its inception, and in fact suggested that USHA cease working with the Firm and offer its own loan modification services. She also came up with the deceptive assertion that USHA had a '97% success rate' in its loan modification business. Substantial evidence established that she aided and abetted Sarpas, Nazarzai, and other employees, independent contractors, and agents of USHA in the violation of the UCL and the FAL."

Substantial evidence supported the trial court's findings, and they are sufficient to impose liability against Fasela under the UCL and FAL. Fasela testified at

30

her deposition (portions of which were read into evidence at trial), she suggested USHA go into the loan modification business, was present when USHA was created, and, among other things, served as its office manager. As the sales floor manager, Fasela monitored the sales force, and made sure the sales representatives "followed policy and procedure," called leads, and met their quotas, answered customers' questions, and handled customers' complaints. Fasela also received leads and made sales calls herself. She communicated between the processing department and the sales force because she understood how both sides operated. Fasela oftentimes ran the company meetings held every Wednesday and distributed the scripts for sales representatives to use. Fasela was a compliance officer for USHA and in that capacity had to approve new customers. She closed completed files, maintained records of loans modified according to her definition of modification, and came up with the 97 percent success figure used in USHA marketing and promotion.[7]

When asked to describe her role at USHA, Fasela testified at her deposition (read into evidence at trial): "I was administration. I was helping the processing team. I was . . . helping with the sales floor, managing. I helped with the receptionist. I'd help with gathering payroll for agents. I was helping with complaints if they came in."

Sarpas and Fasela argue that Fasela, at most, can be held liable for restitution "to the 3 consumers who testified as to potential violations committed by her." This argument ignores Fasela's role in participating in, and aiding and abetting, Sarpas, Nazarzai, and USHA in their overall scheme, which harmed hundreds of people. As compensation for participating in, and aiding and abetting, the scheme constituting the UCL and FAL violations, Fasela received $147,869 from USHA. Although Fasela did

---

[7] Fasela claimed that loan modifications, under her definition of the term, were in fact completed by USHA; however, the trial court found not credible her "denials, explanations, assertions regarding purported statements made to and benefits purportedly provided to USHA's customers, and similar self-serving testimony."

31

not receive funds directly from USHA customers, she did receive compensation from USHA's income from victims of the scheme in which Fasela participated. Thus, Fasela received $147,869 from USHA customers, and is responsible, jointly and severally with USHA, Sarpas, and Nazarzai, for restitution up to that amount.


**IV.**

**The Award of Civil Penalties Imposed Against Sarpas
Was Supported by the Law and the Evidence; the Amount
of Civil Penalties Against Fasela Must Be Recalculated.**

A. *Background and Relevant Law*

Pursuant to sections 17206 and 17536, the trial court imposed civil penalties against USHA, Sarpas, and Nazarzai, jointly and severally, in the amount of $2,047,041, and imposed additional civil penalties against Fasela, USHA, Sarpas, and Nazarzai, jointly and severally, in the amount of $360,540. In setting the amount of civil penalties, the court considered (1) the purpose of civil penalties to punish and deter; (2) Defendants' targeting of the elderly and the disabled; (3) the "enormous" number of UCL and FAL violations committed by Defendants; and (4) evidence establishing there were 1,259 "payors" checks deposited into USHA accounts.

Section 17206, subdivision (a) states in part that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation." Section 17536, subdivision (a) states in part that "[a]ny person who violates any provision of this chapter shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation." UCL penalties may be increased by up to $2,500 per violation if the victim is elderly or disabled. (§ 17206.1.) Under both section 17206, subdivision (b) and section 17536, subdivision (b), the court should consider, in assessing the amount of civil penalties, one or more of the following: "the

32

nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth."

For the purpose of calculating civil penalties, what constitutes a violation of the UCL or the FAL depends on the circumstances of the case, including the type of violations, the number of victims, and the repetition of the conduct constituting the violation. (*People v. JTH Tax, Inc.*, *supra*, 212 Cal.App.4th at p. 1251; *Kennedy*, *supra*, 111 Cal.App.4th at p. 129.) We review the trial court's imposition of civil penalties under the UCL and FAL under the abuse of discretion standard. (*People v. JTH Tax, Inc.*, *supra*, at p. 1250.)

B. *The Evidence Supported Imposition of Civil Penalties.*

Sarpas and Fasela challenge the imposition of civil penalties on the same grounds on which they challenge restitution: They contend the evidence showed they violated the UCL or FAL at most only three times and there was no evidence that either of them was an active participant in or aided and abetted any violations by others. We rejected those contentions when addressing restitution, and we reject them again now. As we have emphasized, individualized proof of each and every UCL and FAL violation is not required; from the evidence presented at trial, the trial court could draw the reasonable inference Sarpas and Fasela committed hundreds, if not thousands, of UCL and FAL violations. In this regard, the trial court found: "Defendants made false and misleading statements to each and every consumer who entered into a contract with Defendants. Further, Defendants used deceptive telemarketing scripts and other false and misleading marketing materials, and therefore civil penalties are appropriate for each consumer who spoke with a USHA representative and/or received USHA marketing materials, even if they never became a client of USHA."

Sarpas and Fasela argue the amount of civil penalties is excessive in light of their respective financial situations. A court should consider a defendant's assets,

liabilities, and net worth in calculating the amount of civil penalties. (§§ 17206, subd. (b), 17536, subd. (b).) But, "evidence of a defendant's financial condition, although relevant, is not essential to the imposition of the statutory penalties, making the issue of a defendant's financial inability a matter for the defendant to raise in mitigation." (*First Federal*, *supra*, 104 Cal.App.4th at p. 726.) Sarpas did not testify at trial. Fasela testified some about her financial situation, but she presented no documentary evidence in support, and the trial court found her testimony on the subject was not credible. As to Sarpas, all the civil penalties are affirmed.

C. *Amount of Civil Penalties Against Fasela*

Fasela alone argues there was no legal basis for imposition of $360,540 in civil penalties against her. Sarpas does not make this argument. The only explanation for that amount, she claims, is "[t]he Trial court found Fasela complicit in defendant Nazarzai's failure to turn over $360,540 to the Receiver." The Attorney General does not address this argument. The trial court offered no explanation or computation for coming up with $360,540, despite requests from Fasela to make factual findings. We agree the amount of civil penalties imposed against Fasela does not appear to be tethered to sections 17206 and 17536. She is, however, subject to civil penalties. We therefore will strike the civil penalties awarded against Fasela only and remand with directions to recalculate the amount of civil penalties under sections 17206 and 17536.

# V.

## Sarpas and Fasela Were Not Denied Their Due Process Rights to Confront and Cross-examine Witnesses.

Sarpas and Fasela contend the imposition of civil penalties and restitution in the amounts set forth in the judgment violated their due process rights to confront and cross-examine witnesses and to receive notice of the charges against them. In civil actions, the right to confront and cross-examine witnesses is found in the due process

34

clause rather than the confrontation clause.[8] (*People v. Otto* (2001) 26 Cal.4th 200, 214; *In re Malinda S.* (1990) 51 Cal.3d 368, 383, fn. 16.) Sarpas and Fasela were not denied the right to confront and cross-examine witnesses. They appeared at trial with counsel and cross-examined witnesses. They were provided lawful notice of the depositions, but chose not to attend them and cross-examine the deponents, either in person or by telephone. They were provided the names of hundreds of USHA customers, yet chose not to call any of them to testify at trial.

Sarpas and Fasela contend their due process rights were violated because they were ordered to pay restitution to and civil penalties for hundreds of USHA customers who did not testify at trial. The right to confront and cross-examine witnesses applies only to "'witnesses'" who "'bear testimony.'" (*Crawford v. Washington*, *supra*, 541 U.S. at p. 51; see *Davis v. Washington* (2006) 547 U.S. 813, 823.) The USHA customers who did not testify were not witnesses bearing testimony. Restitution was not dependent on their testimony because, as we have emphasized, the UCL and FAL permit restitution without individualized proof of harm (e.g., *People v. JTH Tax, Inc.*, *supra*, 212 Cal.App.4th at p. 1255; *Fremont Life*, *supra*, 104 Cal.App.4th at p. 532), and the testimony and evidence presented at trial was sufficient to draw an inference of classwide deception and injury.

Sarpas and Fasela rely on *Goldberg v. Kelly* (1970) 397 U.S. 254 to support their claim of a due process violation. In that case, the United States Supreme Court addressed the narrow issue whether the due process clause required an evidentiary hearing before a state terminates a recipient's welfare benefits. (*Id.* at p. 260.) The court held that before welfare benefits can be terminated, "a recipient have timely and adequate

---

[8] The confrontation clauses in the federal and state Constitutions are limited to criminal prosecutions and do not apply in civil proceedings. (*Crawford v. Washington* (2004) 541 U.S. 36, 42; *People v. Allen* (2008) 44 Cal.4th 843, 860-861; *People v. Sweeney* (2009) 175 Cal.App.4th 210, 221.)

notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." (*Id.* at pp. 267-268.)

*Goldberg v. Kelly* is inapplicable to this case, except for the broad and indisputable proposition that in government enforcement actions a person has a due process right to notice, and the opportunity to confront and cross-examine witnesses and to present evidence and argument. (*Goldberg v. Kelly*, *supra*, 397 U.S. at p. 270 ["'where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue'"].)

Sarpas and Fasela were not denied those rights. Their claim they did not receive adequate notice of the charges against them borders on the absurd.[9] The Attorney General filed a lengthy complaint apprising Defendants of the charges and of the fact the Attorney General was seeking injunctive relief, restitution, and civil penalties. Attached to the complaint were declarations from 19 USHA customers. Sarpas and Fasela received lengthy interrogatory responses and were given the names of hundreds of USHA customers. The Attorney General disclosed the names of 16 potential trial witnesses, of whom five were called to testify at trial. Properly noticed depositions were taken, but Sarpas and Fasela chose not to participate in them. Nothing prevented Sarpas and Fasela from conducting their own investigation, interviewing witnesses, taking depositions, and calling witnesses to testify at trial. "In light of the foregoing we are satisfied that the UCL as applied to this case did not violate the federal procedural due process notice requirement." (*Fremont Life*, *supra*, 104 Cal.App.4th at p. 520.)

---

[9] Sarpas and Fasela make the exaggerated and patently incredible claim that they "walked into trial on the first day without any inkling of what they were alleged to have done, to whom, when, and what."

Sarpas and Fasela also contend the judgment violates their due process rights because it allows the Attorney General to pay claimants "at its own discretion" and "affords no requirement that the claimant present its evidence before a Constitutional tribunal and no opportunity for Appellants to confront and cross-examine that claimant in a judicial or judicially supervised manner." The judgment delegates to the Attorney General's Office the authority to administer and oversee the restitution process and provides: "[The Attorney General] is authorized to take any reasonable measure to insure the payment of restitution, including, without limitation: (1) hiring a third party administrator for the restitution process; (2) writing letters, e-mails, and telephone scripting to be used in contacting the Eligible Consumers; (3) sending correspondence to the Eligible Consumers; (4) calling the Eligible Consumers; and (5) sending payment to the Eligible Consumers."

Sarpas and Fasela filed objections to the proposed statement of decision and the proposed judgment. Although they objected that the amount of restitution ordered in the judgment was improper and without factual support, they did not object to the portion of the judgment addressing the Attorney General's authority to administer the restitution process. Accordingly, the objection has been forfeited.

## VI.

### The Trial Court Did Not Err by Receiving in Evidence Checks Deposited into USHA's Bank Account.

A. *Introduction*

The trial court received in evidence the Attorney General's exhibit No. 1, which consisted of the front and back sides of over 1,900 checks deposited into a USHA account at Bank of America. The court received the exhibit in evidence for the limited purpose of establishing "Bank of America deposited into the account of the payee defendant in this action the amount of money that appears on the face amount of the

check based on his testimony of their business practice with respect to how they handle the checks." The court stated it was not receiving exhibit No. 1 under the business records exception to the hearsay rule.

Elizabeth Mason, an associate governmental program analyst employed by the Attorney General's Office, testified she conducted a review of exhibit No. 1 and, from the information contained in it, created a spreadsheet showing a total of $2,224,113.86 was deposited into USHA's Bank of America account and USHA had 1,259 customers.

B. *The Checks Were Authenticated.*

Sarpas and Fasela argue the trial court erred by receiving exhibit No. 1 in evidence because the checks were hearsay and did not fall within the business records exception to the hearsay rule, the ground on which they objected at trial.

The Attorney General does not contend the checks comprising exhibit No. 1 were Bank of America business records. Instead, the Attorney General argues the checks were authenticated for the purpose for which the court admitted exhibit No. 1. We agree.

"Authentication of a writing is required before it may be received in evidence." (Evid. Code, § 1401, subd. (a); see *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 525 ["Generally speaking, documents must be authenticated in some fashion before they are admissible in evidence"].) "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.) "As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.)

38

The Attorney General authenticated the checks with testimony from a representative of Bank of America about how the checks were processed and the bank's custom and practice in accepting and negotiating the checks. The trial court accepted this testimony as sufficient to authenticate the checks for the purpose for which they were received in evidence. Sarpas and Fasela do not challenge this testimony.

C. *The Checks Were Used for the Proper Purpose.*

Sarpas and Fasela argue exhibit No. 1 was used for a purpose other than the limited purpose for which it was received; that is, showing that Bank of America deposited into USHA's account the sums appearing on the faces of the checks. Sarpas and Fasela argue the trial court improperly used exhibit No. 1 in arriving at the total number of USHA customers, the total amount received from USHA customers, the amount of restitution, and the amount of civil penalties. They argue, "[a]ll the Trial Court knew was that Bank of America processed a number of checks: not the payor of the check, whether the payor was a customer; whether the payor was a victim, nor anything of relevance to the action."

The trial court could properly infer, from the totality of evidence presented at trial, the checks comprising exhibit No. 1 were payments from USHA customers, and the total amount received by USHA from those customers was $2,224,113.86. In considering Sarpas and Fasela's objection to exhibit No. 1, the trial court stated: "[I]f [the Attorney General] establish[es] through the[] evidence this business model of how your clients' company operated and allegedly defrauded 2 million plus dollars from people in a mortgage modification scam, if they establish that this was—how their business model worked, I, as the factfinder, can say I find it to be more likely to be true and not true that these people gave them this money to get loan modification services. [¶] Now, I don't know what the evidence will be. But I've got a sneaking suspicion a big part of it's going to be the only thing they provided as a service to people was loan modification services and maybe A, B or C. If that's the only business they're in and

39

they're getting checks from people, a natural inference to be drawn from those facts is . . . they were conducting business; these people were trying to retain their services."

As the trial court suspected, the evidence at trial established that, during the relevant time frame: (1) USHA's business was primarily, if not exclusively, providing supposed loan modification services; (2) customers retained USHA to provide those services; (3) customers paid USHA by check for those services; and (4) $2,224,113.86 in checks were deposited in USHA's Bank of America account. Sarpas and Fasela presented no evidence to show that any of USHA's income—i.e., the deposits made into the Bank of America account—came from a source other than the loan modification business. From the evidence, the trial court could draw the reasonable inference, which it expressed in the statement of decision, that "[a]s a result of [Defendants'] deceptive and misleading practices, USHA procured over $2 million in up-front payments from consumers." It was equally reasonable for the trial court to set the maximum amount of restitution at $2,047,041.86. It could be true, as Sarpas and Fasela assert, that many of the payors on the checks were not victims, but those payors will not be able to obtain restitution, and Sarpas and Fasela's potential liability will be reduced correspondingly. (See *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 137 [fluid fund recovery not permitted in UCL actions].)

Mason testified USHA had 1,259 different customers. Sarpas and Fasela objected to Mason's worksheets (exhibit No. 558), but did not object to or move to strike Mason's testimony of the number of USHA customers. Responding to the objection to that exhibit, the trial court stated: "[T]his is the backup for the grand total numbers as described, which have been testified to. So that testimony's in evidence as to what the numbers are." Based on Mason's testimony of the number of USHA's customers, to which Sarpas and Fasela posed no objection, the trial court properly calculated the amount of civil penalties.

40

### DISPOSITION

The civil penalties in the amount of $360,540 as to Fasela, and Fasela only, are stricken, and the matter is remanded to the trial court with directions to recalculate the amount of civil penalties for which she may be liable. In all other respects, the judgment is affirmed. Respondent shall recover costs on appeal.

FYBEL, J.

WE CONCUR:

ARONSON, ACTING P. J.

THOMPSON, J.

41

Filed 5/6/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G047462 |
|      v. | (Super. Ct. No. 30-2009-00125950) |
| HAKIMULLAH SARPAS et al., | ORDER GRANTING REQUEST FOR PUBLICATION |
|    Defendants and Appellants. | |

Housing and Economic Advocates, National Housing Law Project, the East Bay Community Law Center, and the Public Good Law Center have requested that our opinion, filed April 24, 2014, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED. The opinion is ordered published in the Official Reports.

FYBEL, J.

WE CONCUR:

ARONSON, ACTING P. J.

THOMPSON, J.